RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2001 FED App. 0329P (6th Cir.)
File Name:  01a0329p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

RICHARD LEMARBE,
        *Plaintiff-Appellee,*

        *v.*

JEROME J. WISNESKI,
        *Defendant-Appellant,*

SHARON FAIRBANKS; DENNIS
STRAUB,
                *Defendants.*

No. 00-1383

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 98-74028—Denise Page Hood, District Judge.

Argued:  June 8, 2001

Decided and Filed:  September 19, 2001

Before:  KEITH, BATCHELDER, and MOORE, Circuit
Judges.

———————————

**COUNSEL**

**ARGUED:** John L. Thurber, OFFICE OF THE ATTORNEY GENERAL, CORRECTIONS DIVISION, Lansing, Michigan, for Appellant. John M. Leh, SERMAN & LEH, Lake Orion, Michigan, for Appellee. **ON BRIEF:** John L. Thurber, OFFICE OF THE ATTORNEY GENERAL, CORRECTIONS DIVISION, Lansing, Michigan, for Appellant. John M. Leh, SERMAN & LEH, Lake Orion, Michigan, for Appellee.

MOORE, J., delivered the opinion of the court, in which KEITH, J., joined. BATCHELDER, J. (pp. 19-21), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge. On June 30, 1998, Plaintiff-Appellee Richard LeMarbe ("LeMarbe"), a Michigan state prisoner, filed this lawsuit against Cotton Correctional Facility, Duane L. Waters Hospital, Sharon Fairbanks, Dennis Straub, Defendant-Appellant Dr. Jerome Wisneski ("Dr. Wisneski"), Dr. Allen Price, and a John Doe defendant, alleging that the defendants displayed deliberate indifference to his serious medical needs in violation of his rights under the Eighth Amendment. During the course of this lawsuit, all of the defendants, except for Dr. Wisneski, were dismissed from this action through either voluntary dismissal or summary judgment.[1] On March 31, 2000, the

———————————

[1] On December 16, 1998, the district court, upon the agreement of the parties, dismissed with prejudice Defendants Cotton Correctional Facility and Duane L. Waters Hospital. Dr. Price and the John Doe defendants were voluntarily removed from this case when LeMarbe filed his amended complaint without any reference to these parties. On March 31, 2000, the district court accepted the magistrate judge's report and recommendation

district court accepted the magistrate judge's report and recommendation to deny Dr. Wisneski's motion for summary judgment based upon qualified immunity. Dr. Wisneski now appeals the district court's denial of his motion for summary judgment. For the reasons that follow, we **AFFIRM** the district court's decision.

## I. BACKGROUND

LeMarbe is a state prisoner at the Cotton Correctional Facility in Ionia, Michigan. On July 11, 1996, LeMarbe sought medical treatment for severe abdominal pain at Duane L. Waters Hospital, which is operated and controlled by the State of Michigan at the Charles E. Egeler Facility in Jackson, Michigan. At the hospital, LeMarbe was treated by a general surgeon named Dr. Wisneski, who discovered during the course of the appointment that LeMarbe suffered from chronic gallstone problems, specifically cholecystitis, and scheduled LeMarbe for surgery to remove his gallbladder.

On July 22, 1996, Dr. Wisneski performed a cholecystectomy or gallbladder removal surgery on LeMarbe at the Duane L. Waters Hospital. On July 24 and 25, 1996, Dr. Wisneski met with LeMarbe for follow-ups to his surgery and noted that LeMarbe was recovering well.

On July 26, 1996, however, LeMarbe's recovery noticeably began to falter, and as a result, Dr. Edgar Eichum, another general surgeon at Duane L. Waters Hospital, ordered lab tests on LeMarbe. On July 29, 1996, Dr. Wisneski reviewed the results of LeMarbe's lab tests and met with LeMarbe. The results of these lab tests indicated that LeMarbe may have had "a bile leak somewhere, or a bile obstruction." Joint Appendix ("J.A.") at 34 (Wisneski Dep. at 16).

---

to grant Fairbanks's and Straub's motions for summary judgment based upon qualified immunity. LeMarbe is not appealing the district court's decision on Fairbanks's and Straub's motions for summary judgment.

On July 30, 1996, Dr. Wisneski met with LeMarbe again and observed that LeMarbe "wasn't doing as well as [Dr. Wisneski] wanted [LeMarbe] to be doing." J.A. at 35 (Wisneski Dep. at 17). Later that day, Dr. Wisneski "put down a nastrogastric tube to empty [LeMarbe's] stomach," as LeMarbe was suffering from symptoms of nausea and abdominal distention. J.A. at 35 (Wisneski Dep. at 18). After unsuccessfully taking other steps to resolve LeMarbe's problems, Dr. Wisneski made a decision to perform exploratory surgery on LeMarbe.

On July 31, 1996, Dr. Wisneski began to conduct an exploratory laparotomy on LeMarbe. Upon entering LeMarbe's abdomen during the laparotomy, Dr. Wisneski encountered approximately five liters of a "muddy yellow-brown odorless fluid." J.A. at 36 (Wisneski Dep. at 21). According to Dr. Wisneski, the fluid "looked like ascitic fluid," but "from the color of it [he] thought it was [biliary fluid because] [i]t was lightly tinged yellow and there isn't anything in the abdomen that would give it that color other than bile." J.A. at 36 (Wisneski Dep. at 21-22). Dr. Wisneski then began to look for the source of the leak. Unable to discover the reasons for the fluid, Dr. Wisneski sought the assistance of Dr. Eichum. Dr. Eichum, however, was also unable to uncover the reason for the fluid. Thereafter, Dr. Wisneski drained the fluid from LeMarbe's abdomen and, although he was concerned about the fluid collecting again in LeMarbe's abdomen, Dr. Wisneski closed LeMarbe's surgical incision and ended the exploratory surgery.

On August 1 and 2, 1996, Dr. Eichum saw LeMarbe again, and according to Dr. Wisneski, LeMarbe's abdomen was not distended at that time. A few days later, on August 5, 1996, Dr. Wisneski saw LeMarbe once more and discharged him the following day. On August 13, 1996, Dr. Wisneski saw LeMarbe again, as LeMarbe's abdomen had become quite distended for a second time. Dr. Wisneski finally referred LeMarbe to a gastroenterologist, Dr. Marlo Hurtado, who saw LeMarbe on August 14, 1996. Thereafter, Dr. Wisneski did not see LeMarbe again.

285, 291-92 (1976).[2] (Deliberate indifference does not include negligence in diagnosing a medical condition.).

In departing from *Williams* and *Farmer*, the majority violates the venerable rule in this circuit that one panel may not overrule the published precedent of another panel, let alone the precedent established by the en banc court. *See Meeks v. Illinois Cent. Gulf R.R.*, 738 F.2d 748, 751 (6th Cir. 1984) ("[A] panel of this court may not overrule a previous panel's decision. Only an en banc court may overrule a circuit precedent, absent an intervening Supreme Court decision.") (citing *Timmreck v. United States*, 577 F.2d 372, 376 n. 15 (6th Cir.1978), *rev'd on other grounds*, 441 U.S. 780, 99 S. Ct. 2085 (1979)).[3] For all of these reasons, I dissent.

---

[2] *See also Sanderfer v. Nichols*, 62 F.3d 151, 154 (6th Cir. 1995) ("Deliberate indifference, however, does not include negligence in diagnosing a medical condition.") (citing *Estelle*, 429 U.S. at 106, 97 S. Ct. at 292).

[3] *See also Chrisner v. Complete Auto Transit, Inc.*, 645 F.2d 1251, 1267 n.6 (6th Cir. 1981) ("It has been the policy of this circuit that one panel cannot overrule the decision of another panel absent either intervening Supreme Court authority to the contrary or other circumstances which render the precedent clearly wrong. [citation omitted] . . . It is my hope that both the majority's disregard for circuit precedent and its misanalysis of the business necessity issue will be regarded as aberrational.") (Keith, J., dissenting).

inference of excessive risk could be drawn, and second, that Dr. Wisneski actually drew that inference. But Sarnelle's affidavit simply provides Sarnelle's opinion of what Dr. Wisneski or anyone with a medical education should have known. Sarnelle's affidavit thus provides an objective standard, not a subjective one, and this is wholly insufficient to show an Eighth Amendment violation. *See Farmer*, 511 U.S. at 837-38, 114 S. Ct. at 1979 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference . . . [A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.").

To the extent that the majority points to evidence besides Dr. Sarnelle's affidavit to establish Dr. Wisneski's alleged deliberate indifference, I respectfully disagree. Again, *Williams* and *Farmer* demand that we apply a subjective standard. Here, applying that subjective standard requires LeMarbe to show that Dr. Wisneski actually identified a severed bile duct as the problem and then, despite having identified the problem, Dr. Wisneski sewed up LeMarbe, aware that substantial harm would likely result. But that is simply not what the record evidence shows in this case.

What the undisputed record evidence shows is that both Dr. Wisneski and Dr. Eichum looked for a leak in LeMarbe's bile duct, and when they found no leak, erroneously concluded that there was none and closed LeMarbe's incision. While Drs. Wisneski and Eichum may have committed medical malpractice when they failed properly to diagnose LeMarbe's problem, they did not violate LeMarbe's Eighth Amendment rights. *See Estelle v. Gamble*, 429 U.S. 97, 105-06, 97 S. Ct.

Dr. Hurtado sent LeMarbe to Foote Hospital on August 16, 1996. On August 20, 1996, Dr. Blaine Tacia performed another exploratory surgery with an intraoperative cholangiogram on LeMarbe. In so doing, Dr. Tacia discovered that LeMarbe's abdomen was distended due to fourteen liters (3 ½ gallons) of bile in the peritoneal cavity in his abdomen. Dr. Tacia commented that the adhesions inside LeMarbe's belly cavity were among the worst he had ever seen and that the accumulation of bile in LeMarbe's abdomen had caused serious damage to LeMarbe's biliary tract. Dr. Tacia discovered that the leak of fluid was due to a complete transection of LeMarbe's common bile duct[2] and found a clip on that duct, which Dr. Tacia explained was unusual.[3] Dr. Tacia also stated that the transection occurred during one of Dr. Wisneski's surgeries. According to Dr. Tacia, the transection necessitated an immediate repair of the leak, as "there [was] no way for the bile to get down into the bowel." J.A. at 144 (Tacia Dep. at 24).

Because of the extensive damage in LeMarbe's abdomen, Dr. Tacia then performed a Roux-en-Y choledochojejunostomy on LeMarbe. Despite this surgery, however, LeMarbe still had to undergo several more surgeries

---

[2]Dr. Tacia later explained that he didn't "know whether it was a common bile duct or whether it was a common hepatic duct" because the adhesions in LeMarbe's abdomen were so terrible. J.A. at 142 (Tacia Dep. at 16). According to Dr. Tacia, "[t]he common hepatic duct is the bile duct that exists before the cystic duct enters; and the common bile duct is where the bile duct exists between after where the cystic duct has entered it and where it enters into the bowel, goes through the pancreatic substance and enters into the bowel." J.A. at 142 (Tacia Dep. at 15).

[3]Dr. Tacia testified that he could think of no reason for a clip to be on the common bile or common hepatic duct. J.A. at 147 (Tacia Dep. at 35-36). According to Dr. Tacia, it would not have been unusual to find a clip on the cystic duct, which would have to be transected during a gallbladder removal surgery. J.A. at 147 (Tacia Dep. at 36-37). He further explained that the bile likely would have stopped leaking if the leak was from the cystic duct as cystic duct leaks would eventually seal off. J.A. at 148 (Tacia Dep. at 37).

at Foote Hospital and at the Detroit Receiving Hospital. In fact, LeMarbe was in and out of hospitals for the two years following his surgery with Dr. Tacia.

As a result of his medical treatment at Duane L. Waters Hospital, LeMarbe filed this lawsuit, alleging a violation of his constitutional right to have his serious medical needs attended to without deliberate indifference. On March 31, 2000, the district court issued an opinion and order accepting the report and recommendation of the magistrate judge to deny Dr. Wisneski's motion for summary judgment, holding that LeMarbe "ha[d] presented sufficient facts to rebut Defendant Wisneski's claim that he was not deliberately indifferent to [LeMarbe's] serious medical needs." J.A. at 183. In so doing, the district court relied heavily on the affidavit of Dr. James Sarnelle, a general surgeon who asserted that LeMarbe's bile leak had to be stopped immediately after its discovery. Dr. Sarnelle explained that any general surgeon would have known, upon discovering five liters of bile in LeMarbe's abdomen on July 31, 1996, that the bile in the abdomen came from a leak, that the bile leak would cause serious, permanent damage to LeMarbe if not stopped, that bile would continue to leak into LeMarbe's abdomen if the bile leak was not stopped, that the bile leak needed to be stopped before LeMarbe's exploratory surgery ended, and that LeMarbe had to be referred immediately to a specialist who could locate and stop the leak if the surgeon was unable to do so himself. J.A. at 104 (Sarnelle Aff.). Dr. Sarnelle also stated that "[t]he risk of harm to Richard LeMarbe on 7/31/96 was extreme and obvious to anyone with a medical education and to most lay people." J.A. at 104 (Sarnelle Aff.).

## II. ANALYSIS

Dr. Wisneski argues that he is entitled to qualified immunity because he merely exercised his medical judgment in deciding how to treat LeMarbe, and a dispute over the specific method of treatment does not rise to the level of deliberate indifference. "Qualified immunity is 'an

---

### DISSENT

---

ALICE M. BATCHELDER, dissenting. Because the majority departs from our en banc opinion in *Williams v. Mehra*, 186 F.3d 685 (6th Cir. 1999) and Supreme Court precedent, I respectfully dissent. In *Williams*, we spoke definitively to the question of what kind of standard (subjective or objective) we must apply in § 1983 cases brought by a prisoner hoping to allege an Eighth Amendment violation because some prison official allegedly acted with deliberate indifference towards the prisoner's serious medical needs. That standard is unequivocally a subjective standard. *See Williams*, 186 F.3d at 692 ("To make this case, Plaintiff would need to show that the doctor[] actually knew" about an excessive risk and disregarded that risk.).

More importantly, *Farmer v. Brennan*, 511 U.S. 825, 114 S. Ct. 1970 (1994), could not have been more clear that it is a subjective standard federal courts must apply in cases such as this. *See Farmer*, 511 U.S. at 829, 114 S. Ct. at 1974 ("This case requires us to define the term 'deliberate indifference,' as we do by requiring a showing that the official was *subjectively* aware of the risk.") (Emphasis added.).[1] But as is clear from the majority's opinion, the majority applies an objective standard to conclude that Dr. Wisneski may have acted with deliberate indifference towards LeMarbe's serious medical needs.

Nowhere is this more clear than in the majority's relying upon an affidavit from an expert witness, Dr. Sarnelle. To make out the subjective showing that *Farmer* requires, Sarnelle's affidavit would have to say that Sarnelle knows, first, that Dr. Wisneski actually knew facts from which an

---

[1] *See also Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979 ("We reject petitioner's invitation to adopt an objective test for deliberate indifference.").

that a prison doctor may exhibit deliberate indifference by intentionally delaying access to medical care).

## III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's decision to deny Dr. Wisneski's motion for summary judgment based upon qualified immunity and remand for further proceedings.

entitlement not to stand trial or face the other burdens of litigation.'"  *Saucier v. Katz*, --- U.S. ---, 121 S. Ct. 2151, 2156 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  A government official performing a discretionary function is entitled to qualified immunity from a suit for civil damages unless his actions have violated a clearly established statutory or constitutional right. *Sanderfer v. Nichols*, 62 F.3d 151, 153 (6th Cir. 1995) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Thus, a plaintiff must prove two factors to show that a government official is not entitled to qualified immunity from his suit:  (1) that the facts as alleged by him show a violation of a constitutional right; and (2) that such violated right was clearly established.  *Saucier*, 121 S. Ct. at 2155.

### A.  Jurisdiction

Before we address the merits of Dr. Wisneski's arguments, however, we must first address the question whether we have jurisdiction over Dr. Wisneski's appeal.  The Supreme Court has explained that a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable final decision within the meaning of 28 U.S.C. § 1291 under the collateral order doctrine.  *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).  In *Johnson v. Jones*, 515 U.S. 304 (1995), the Supreme Court clarified that the *Mitchell* decision was explicitly limited to appeals challenging only the purely legal issues of whether the alleged facts amounted to a constitutional violation and what law was clearly established, and "not a district court's determination about what factual issues are 'genuine.'"  *Id.* at 313 (quoting FED. R. CIV. P. 56(c)).  Therefore, "in order for an interlocutory appeal to be appropriate, a defendant seeking qualified immunity must be willing to concede to the facts as alleged by the plaintiff and discuss only the legal issues raised by the case."  *Shehee v. Luttrell*, 199 F.3d 295, 299 (6th Cir. 1999), *cert. denied*, 530 U.S. 1264 (2000); *see also Booher v. Northern Ky. Univ. Bd. of Regents*, 163 F.3d 395, 396 (6th Cir. 1999).

In this case, because Dr. Wisneski has stipulated to LeMarbe's version of the facts for purposes of appeal, the issues in this case involve only the legal questions of (1) whether the facts as alleged by LeMarbe show a violation of a constitutional right; and (2) whether that right, when viewed in the specific context of this case, was clearly established. *See Saucier*, 121 S. Ct. at 2156; *Johnson*, 515 U.S. at 313. As a result, we hold that the district court's denial of qualified immunity is a "final decision" under § 1291 and that we have jurisdiction to decide this case on the merits of the qualified immunity issue. *See Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999).

## B. Qualified Immunity

Upon review of the merits of Dr. Wisneski's appeal, we conclude that the district court did not err in denying Dr. Wisneski's motion for summary judgment based upon qualified immunity. In this case, LeMarbe has not only alleged facts that would prove a violation of one of his constitutional rights; he has also successfully shown that such right was clearly established. We note that since Dr. Wisneski has stipulated to LeMarbe's version of the facts for purposes of this appeal, we must view "the evidence, all facts, and any inferences that may be drawn from the facts . . . in the light most favorable" to LeMarbe. *Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619, 622 (6th Cir. 2000); *see also Shehee*, 199 F.3d at 299.

### 1. Violation Of Constitutional Right

We first conclude that LeMarbe has alleged facts that, when viewed in his favor, would prove a violation of his constitutional right to have his serious medical needs treated without deliberate indifference. Under the Eighth Amendment, a prisoner has a right not to have prison officials act with deliberate indifference to his health and safety. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The Supreme Court has explained that "deliberate indifference describes a state of mind more blameworthy than negligence" and that it entails

substantial risk of serious harm; and that Dr. Wisneski disregarded such risk by failing to take the actions he knew were necessary to avoid the potentially serious harm to LeMarbe. Consequently, and consistent with *Williams*, we hold that LeMarbe has established that the facts as alleged by him show a constitutional violation.

### 2. Clearly Established Right

We also conclude that LeMarbe has successfully proven that the allegedly violated right was clearly established. Although a government doctor is entitled to qualified immunity if he has merely made a reasonable mistake in his medical judgment, he is not entitled to such immunity if he correctly perceived all the relevant facts, understood the consequences of such facts, and disregarded those consequences in his treatment of a patient. *Saucier*, 121 S. Ct. at 2158-59; *Farmer*, 511 U.S. at 842-43. As the Supreme Court has repeatedly recognized, a prisoner has a right not to have his serious medical needs disregarded by his doctors. *Estelle*, 429 U.S. at 104. Assuming that a jury accepts the facts as alleged by LeMarbe and believes the affidavit of Dr. Sarnelle, in which Dr. Sarnelle claimed that Dr. Wisneski, as a person with a medical education, must have been aware of the risk posed to LeMarbe, then Dr. Wisneski's actions cannot, under all relevant precedents, reasonably be considered to be the result of a mere reasonable mistake or negligence but only the result of a conscious disregard for LeMarbe's health. It is clearly established that, if a doctor knows of a substantial risk of serious harm to a patient and is aware that he must either seek immediate assistance from another doctor to prevent further serious harm or must inform the patient to seek immediate assistance elsewhere, and then fails to do in a timely manner what his training indicates is necessary to prevent such harm, that doctor has treated the patient with deliberate indifference. *See Farmer*, 511 U.S. at 837 (stating that a prison doctor may exhibit deliberate indifference if he "knows and disregards an excessive risk to inmate health or safety"); *Estelle*, 429 U.S. at 104-05 (noting

needs because they failed to give him his medication in liquid, as opposed to pill, form, we concluded that there were inadequate facts to support the claim of deliberate indifference. For, although we attributed to the doctors knowledge that the prisoner had previously attempted to kill himself by hoarding pills, as well as knowledge that liquid medications reduce the likelihood of hoarding medicine, we stated that there was no possible Eighth Amendment violation because there was no evidence "that pill lines are generally less effective at preventing hoarding, or that this [was] true at [the prison facility] in particular" and there was no "evidence that any of the [doctors] knew that the pill line was not effective at preventing hoarding of medication." *Id.* at 692. We also remarked that "[t]here is nothing to suggest that the doctors were failing to treat [the decedent] or doing less than their training indicated was necessary." *Id.* Finally, we held that there needed to be evidence "that the doctors actually knew that dispensing [the] tablets in a pill line constituted an excessive risk to [the decedent's] health or safety" to deny the doctors' motion for summary judgment based on qualified immunity. *Id.* In essence, in *Williams*, we held that the § 1983 claim must fail because there was no proof that the doctors were aware of the facts from which an inference of a substantial risk of serious harm could be drawn (in particular, that the use of pill lines is less effective at preventing hoarding than the use of liquid medication) and that the doctors drew that inference of a substantial risk (in particular, that the doctors knew that the pill line was not effective at preventing hoarding and that the doctors knew that dispensing tablets in a pill line constituted an excessive risk to the prisoner's health).

Unlike in *Williams*, LeMarbe has presented adequate factual evidence to support his claim that Dr. Wisneski drew the inference of a substantial risk of serious harm to LeMarbe and disregarded it. Specifically, LeMarbe has submitted proof that supports his contention that Dr. Wisneski knew that the fluid in LeMarbe's abdomen was bile and that the bile came from a leak; that Dr. Wisneski knew that the bile leak, if not stopped immediately, would expose LeMarbe to a

"something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835; *Estelle*, 429 U.S. at 105 ("An accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain."). Consequently, a prison official is only "found liable under the Eighth Amendment for denying an inmate humane conditions of confinement [if] the official knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. As the Supreme Court explained, "*the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.*" *Id.* (emphasis added); *see also Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976) (noting that courts are not "to engage in the process of second-guessing in every case the adequacy of medical care that the state provides") (citation omitted). "*Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . .* and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (emphasis added); *see also Brooks v. Celeste*, 39 F.3d 125, 128-29 (6th Cir. 1994).

In this case, LeMarbe has presented factual evidence, which when viewed in a light most favorable to him, would prove that Dr. Wisneski was aware of facts that supported an inference of a substantial risk of serious harm to LeMarbe and that Dr. Wisneski had both drawn and disregarded that inference when he closed LeMarbe's surgical incision on July 31, 1996, and then failed to take the action that his training indicated was necessary to stop the bile leak in a timely manner. As the Supreme Court explained in *Farmer*, a prisoner "need not show that [the] prison official acted or failed to act believing that harm actually would befall [the prisoner to prove a violation of his Eighth Amendment right]; it is enough [for the prisoner to show] that the official acted

or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842.

### a.   Facts From Which Inference Of Substantial Risk Of Serious Harm Could Be Drawn

First, we conclude that LeMarbe has alleged facts that, when viewed in a light most favorable to him, would show that Dr. Wisneski was aware of facts from which a substantial risk of serious harm could be inferred.   These facts are: (1) that Dr. Wisneski encountered five liters of fluid in LeMarbe's stomach on July 31, 1996, and knew that the fluid was bile; (2) that Dr. Wisneski knew that the bile came from a leak;[4] (3) that Dr. Wisneski knew that he had not stopped

---

[4]To support his factual allegations that Dr. Wisneski knew that the fluid in LeMarbe's abdomen was bile and that Dr. Wisneski knew that the bile came from a leak, LeMarbe provided the following evidence. LeMarbe presented deposition testimony from Dr. Tacia, in which Dr. Tacia asserted that the muddy yellowish-brown fluid he encountered in LeMarbe's abdomen was clearly bile.  During his deposition, Dr. Tacia stated that he could tell the fluid in LeMarbe's abdomen was bile "[j]ust by looking at it.  Biliary fluid has a yellowish color to it.  It's slightly thick.  And this looked exactly like biliary fluid."  J.A. at 141 (Tacia Dep. at 12).  Additionally, LeMarbe presented testimony from Dr. Wisneski himself, which suggested that Dr. Wisneski knew that the fluid in LeMarbe's abdomen was bile.  J.A. at 34.  For example, Dr. Wisneski asserted that the fluid "looked like ascitic fluid," but "from the color of it [he] thought it was [biliary fluid because] [i]t was lightly tinged yellow and there isn't anything in the abdomen that would give it that color other than bile."  J.A. at 36 (Wisneski Dep. at 22).  Finally, LeMarbe presented evidence to support his allegation that Dr. Wisneski knew that the bile came from a leak.  Such evidence included an affidavit from Dr. Sarnelle, stating that any general surgeon who had encountered the five liters in LeMarbe's stomach would have known that the "[b]ile was leaking from some place."   J.A. at 104 (Sarnelle Aff.).  LeMarbe also provided deposition testimony from Dr. Wisneski, who testified to looking for the source of the leak during the July 31, 1996 exploratory surgery and to seeking help from Dr. Eichum to find the source of the leak.  J.A. at 36 (Wisneski Dep. at 21).  Dr. Wisneski also testified:

> *Q: You would think that he had a bile leak or a bile obstruction by looking at these lab results by looking at the elevated bilirubin on July 27th, 96?*

---

ignored.'").  Similarly, the fact that Dr. Wisneski eventually referred LeMarbe to a specialist does not automatically immunize Dr. Wisneski from liability for LeMarbe's intervening injuries.  For, as many federal courts have recognized, a deliberately indifferent delay in giving or obtaining treatment may also amount to a violation under the Eighth Amendment. *See, e.g., McElligott v. Foley*, 182 F.3d 1248, 1257 (11th Cir. 1999).

In sum, we conclude that, when viewed in a light most favorable to LeMarbe, the facts as alleged and supported by LeMarbe (that Dr. Wisneski knew that the fluid was bile, was aware of the substantial risk of serious harm as explained by Dr. Sarnelle, and failed to seek adequate help to stop the bile leak in a timely manner despite such knowledge) show that Dr. Wisneski clearly acted with a conscious disregard for LeMarbe's health and safety and violated LeMarbe's Eighth Amendment right to have his serious medical needs attended to without deliberate indifference. In other words, we believe that LeMarbe has raised more than just a simple question of whether Dr. Wisneski made the right medical judgment in treating him.

In that sense, we believe that LeMarbe's case is properly distinguishable from this court's recently decided en banc decision in *Williams v. Mehra*, 186 F.3d 685 (6th Cir. 1999) (en banc).  In *Williams*, the deceased prisoner killed himself by overdosing on an antidepressant prescribed to him by prison doctors.  The deceased prisoner had attempted to kill himself before in a county jail by hoarding pills and then overdosing.  Thereafter, he was transferred to a new prison to begin serving his sentence.  Despite his past attempt to commit suicide by hoarding pills, the deceased prisoner was prescribed antidepressant pills which were administered in a pill line in his new prison.  Even with the precaution of the pill line, the deceased prisoner managed to hoard pills and ultimately killed himself by overdosing.

In reviewing a claim that the various doctors who had cared for the prisoner were deliberately indifferent to his medical

4. *Bile leaking into the peritoneal cavity would certainly cause painful, severe and permanent internal injuries to the patient.*

5. That the bile leak could be located by a hida scan or pre or post op. Exposure of the common bile duct could be done during the procedure on 7/31/96.

6. *That if he could not locate the bile, then he had to refer the patient to someone with the training and experience to find and fix the bile leak.*

J.A. at 104 (Sarnelle Aff.) (emphasis added). We believe that this affidavit, if accepted as true, would prove that Dr. Wisneski's failure to seek help to stop LeMarbe's bile leak in a timely manner constituted a conscious disregard for LeMarbe's health. *See Farmer*, 511 U.S. at 837 (holding that a prison official may be liable under the Eighth Amendment for denying an inmate humane conditions if he knows of and disregards an excessive risk to the inmate's health); *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986) (noting that qualified immunity "provides ample protection to all but the plainly incompetent").

The fact that LeMarbe was seen by Dr. Wisneski and other staff after his exploratory surgery on July 31, 1996 does not necessarily immunize Dr. Wisneski from liability for his actions. A government doctor has a duty to do more than simply provide some treatment to a prisoner who has serious medical needs; instead, the doctor must provide medical treatment to the patient without consciously exposing the patient to an excessive risk of serious harm. As the Seventh Circuit recently recognized in *Sherrod*, "a prisoner is not required to show that he was literally ignored by the staff" to prove an Eighth Amendment violation, only that his serious medical needs were consciously disregarded. *Sherrod*, 223 F.3d at 611-12 ("If knowing that a patient faces a serious risk of appendicitis, the prison official gives the patient an aspirin and an enema and sends him back to his cell, a jury could find deliberate indifference although the prisoner was not 'simply

the bile leak when he closed LeMarbe's surgical incision from the exploratory surgery on July 31, 1996; (4) that Dr. Wisneski made no immediate plans to seek help to stop the bile leak after he sewed LeMarbe back up;[5] and (5) that Dr. Wisneski knew that if the leak were not timely closed, the bile would continue to leak and would cause LeMarbe serious harm.[6]

A:  I mean that's what I would interpret that as.

Q:  And you next saw [LeMarbe] July 29th, 96?

A:  Yes.

Q:  And would you tell us what you charted on that day?

A:  I wrote the patient is feeling much better than yesterday. His bowels are moving, he's eating, has less pain and my plan was to again put him on a regular diet and repeat his labs.

Q:  Had you had the opportunity to see the July 27th, 96 labs at that point in time?

A:  Yes.

Q:  *Did you suspect a bile leak at that point in time based upon the labs?*

A:  *That was a concern, yeah.*

J.A. at 34 (Wisneski Dep. at 16) (emphasis added).

[5] In support of this factual allegation, LeMarbe presented deposition testimony from Dr. Wisneski, in which the doctor explicitly conceded that after he "could find no cause for the fluid . . . [he] elected to close [LeMarbe] up." J.A. at 36 (Wisneski Dep. at 21). LeMarbe also provided evidence to show that Dr. Wisneski did not refer him to a specialist until nearly two weeks after his exploratory surgery on August 13, 1996. J.A. at 38 (Wisneski Dep. at 30).

[6] In support of this factual allegation, LeMarbe submitted an affidavit from Dr. Sarnelle, in which Dr. Sarnelle declared that any general surgeon who had encountered five liters of bile in LeMarbe's abdomen would

When viewed in a light most favorable to LeMarbe, all of the aforementioned facts (which must be conceded by Dr. Wisneski for the purposes of this qualified immunity review), would require the conclusion that Dr. Wisneski knew that a substantial risk of serious harm to LeMarbe existed. It is undisputed that the steady leak of large quantities of bile into LeMarbe's abdomen presented a substantial risk of serious harm to his health and that such a leak continued to present a substantial risk of serious harm to LeMarbe until it was stopped. Indeed, in his affidavit, Dr. Sarnelle unequivocally declared "[t]he risk of harm [from the bile leak] to Richard LeMarbe on 7/31/96 was extreme and *obvious to anyone with a medical education and to most lay people.*" J.A. at 104 (Sarnelle Aff.) (emphasis added). *See Farmer*, 511 U.S. at 842 (holding that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious"). *Cf. Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000) (noting in a case where the medical staff suspected appendictis but failed to treat it that "[a] jury could understand the notation 'rule out appendicitis' to mean that sufficient tests should be performed to eliminate that as a potential cause of [the prisoner's] pain"). In sum, we hold that LeMarbe has successfully alleged facts, which when accepted as true, would prove that Dr. Wisneski was aware of the facts from which a substantial risk of serious harm could be inferred.

---

have known that "[i]f surgery was terminated and the surgical incision was closed, the bile would continue to leak" and that "[b]ile leaking into the peritoneal cavity would certainly cause painful, severe and permanent internal injuries to the patient." J.A. at 104 (Sarnelle Aff.). LeMarbe also provided deposition testimony from Dr. Wisneski, in which Dr. Wisneski admitted to his concerns about the further collection of the potentially caustic bile fluid in LeMarbe's abdomen. When asked if Dr. Wisneski was "concerned that after [he] sewed [LeMarbe] back up that the fluid would collect again," he answered "Absolutely." J.A. at 36 (Wisneski Dep. at 24).

### b.   Drawing The Inference Of Substantial Risk Of Serious Harm And Disregarding It

Second, we conclude that LeMarbe has alleged facts, which when viewed in a light most favorable to him, would show that Dr. Wisneski drew the inference that LeMarbe faced a substantial risk of serious harm from the bile leak in his abdomen and that Dr. Wisneski disregarded such risk when he closed LeMarbe's surgical incision on July 31, 1996, failed to refer LeMarbe *immediately* to a specialist who could stop the leak, and also failed to inform LeMarbe of the failure to stop the leak so that LeMarbe could take any additional measures necessary to stop the leak *in a timely manner*, *i.e.*, request medical treatment from a specialist who could stop the leak. Specifically, LeMarbe has provided an affidavit from Dr. Sarnelle, who swore that "*anyone with a medical education* and [] *most lay people*" who encountered five liters of bile in a patient's abdomen would have known that the bile in LeMarbe's abdomen was due to a leak and that such condition posed a substantial risk of serious harm to LeMarbe if the leak was not closed or stopped before permanent damage occurred. J.A. at 104 (Sarnelle Aff.) (emphasis added). In so doing, Dr. Sarnelle provided the following explanation:

*Any general surgeon* opening Richard LeMarbe's peritoneal cavity on 7/31/96 and seeing 5 liters of bile which had accumulated since a cholecystectomy eight days earlier would know:

1.   *Bile was leaking from some place.*

2.   *The bile leak had to be located and stopped before the surgery was terminated* and the surgical incision was closed.

3.   *If surgery was terminated and the surgical incision closed, the bile would continue to leak.*