NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0902n.06

Case No. 13-6370

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Dec 05, 2014
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| WILLIAM SOURS, Administrator of the Estate of James Sours, deceased, | ) ) ) | |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| BIG SANDY REGIONAL JAIL AUTHORITY; HENRY C. WILLIAMS, JR., individually and in his official capacity; BELHASEN, M.D., individually and in her official capacity; NANCY ALLISON, RN, Individually and in her official capacity; and ROBERT S. SALYER, TOMMY ADKINS, TONY ALLEN, ERNEST JORDAN, PAUL GRIFFITH, JUSTIN BLANTON, BRYAN MONTGOMERY, JOHN AND JANE DOES 1-10, RANDY MADAN, all individually and in their official capacities, | | |
| Defendants-Appellees. | | |

BEFORE: MERRITT, COOK, and STRANCH, Circuit Judges.

JANE B. STRANCH, Circuit Judge. James Sours, a diabetic, was admitted to the Big Sandy Regional Jail on July 13, 2010, and died two days later of diabetic ketoacidosis, a preventable complication of diabetes. Plaintiff William Sours, the administrator of his brother James's estate, brought claims against jail personnel alleging deliberate indifference under 42 U.S.C. § 1983 and state-law negligence. Summary judgment was granted on all relevant claims. As to all claims against Nurse Allison, we REVERSE the summary judgment granted to her by

the district court and remand her case for trial. As to the claims against the remaining defendants, the district court's grant of summary judgment is AFFIRMED.

## I.    FACTUAL RECORD

James Sours, a pretrial detainee, was admitted to the Big Sandy Regional Jail on the afternoon of Tuesday, July 13, 2010, with a blood sugar level of 274 mg/dl. In early adulthood, Sours had been diagnosed with Type I diabetes mellitus. By the end of the day on Thursday, July 15, Sours was dead from diabetic ketoacidosis, with a blood sugar level of 1629 mg/dl.[1] Much happened in the two day interval. But what did not happen was the acquisition or administration of insulin to Sours.

At the time of Sours's admission, the only medical professional at the Jail was Nancy Allison, the jail house nurse. The intake officer sent Sours to her, because Sours said he was diabetic and did not have his insulin with him. Allison provided insulin and medical care for other diabetics in the jail, and she herself is diabetic.

Nurse Allison first saw Sours at 8:15 pm on July 13. Sours told her that he was diabetic, that he had liver problems, high blood pressure, had not seen his doctor in two months, and "[w]as in Highlands about ? one month ago for diabetes." He informed her that he had not taken his insulin for over a month and that he was out of insulin. Allison's notes state that Sours did not take his insulin, but she also wrote that he took Novolog and Lantus—forms of insulin that

---

[1]People with Type I diabetes must take insulin through multiple daily injections. A "well[-]recognized potential but preventable complication of Type I diabetes mellitus" is diabetic ketoacidosis. According to Plaintiff's medical expert, "[i]t occurs when insulin therapy of diabetes is inadequate, resulting in abnormal metabolism, elevated glucose levels, electrolyte abnormalities, dehydration and the production of metabolic acids." Early symptoms of ketoacidosis include an elevated heart rate, rapid respiration, fruity smelling breath, nausea, and sometimes vomiting. Though deadly, if treated early, ketoacidosis has a mortality rate of only 1-10%.

act within 30 minutes to 2 hours—and that he was on a "sliding scale" but gets confused at times and "is not sure when & if he has taken insulin." A sliding scale is a chart that shows how much insulin a particular diabetic should take depending on his blood sugar level throughout the day. Allison also noted that Sours said he did not have anyone to bring his insulin bottles and that he "[s]ays he is not capable of caring for himself."

When checking Sours's blood, Allison noted that his blood sugar was 274 mg/dl and shortly afterward was 283 mg/dl, well above the normal range of 65–100 mg/dl. Allison admitted that this was "a little high." Plaintiff's medical expert, however, said this was "quite high and definitely indicating the need for insulin treatment." Despite Sours's statement that he had not been taking drugs, Allison said she believed that Sours was detoxing from something, and that this can cause blood sugar levels to increase. She, however, failed to ask Sours if he had recently consumed alcohol and could not account for why she did not do so. She faxed her progress note to Dr. Sarah Belhasen that night. Allison neither administered insulin kept at the jail to Sours nor tried to order insulin for him, which was available through overnight mail. Instead, she instituted a standing order to put Sours on a special diet and planned to have the deputy jailers monitor his blood sugar.

The next morning, Wednesday, July 14, at 6:00 am, Nurse Allison checked Sours's blood sugar again, and it was 254 mg/dl. Allison knew that ketoacidosis was a life-threatening risk, but she was satisfied that Sours's blood sugar level was lower than the night before. Around noon, Dr. Belhasen reviewed the progress notes on Sours from the previous day, which indicated to her that Sours was diabetic, hypertensive, and "clearly a sick man." Dr. Belhasen faxed back a response diagnosing Sours with diabetes and saying that she would see Sours on her next visit in four or five days, by which time she wanted blood work done. Dr. Belhasen stated that she was

3

not concerned about seeing Sours right away because she had previously prepared a sliding scale that the nurse could use to determine how much insulin to give to new diabetic inmates until she could get them on regular maintenance. It was her understanding that Allison would use the standard sliding scale to administer insulin kept at the jail or call Sours's pharmacy to obtain his regular insulin until the consultation.

Around 3:00 pm that day, Nurse Allison again saw Sours. She noted that Sours refused to have his blood sugar tested when requested by Deputy Jailer Robert Salyer, but he agreed after Allison encouraged him; his reading was 327 mg/dl. Dr. Belhasen was never made aware that Sours's blood sugar rose to 327 mg/dl but asserts that if she had, she would have told Allison to contact Sours's pharmacy to find out his regular insulin dose and to administer insulin immediately.

Little more than an hour after Sours was returned to his cell, guards again called Allison, informing her that he was acting up, giving the guards a "rough time." Allison had Sours brought back to her office where he appeared to be angry and said that he wanted to go home. She believed he was probably detoxing and he complained of nausea and vomiting and had tremors. Allison admits that nausea, chest pain, and confusion are all signs of ketoacidosis, but said that she still did not believe Sours was at risk. According to Allison, Sours told her that his symptoms were not caused by his blood sugar, and she put him on medication for nausea.

Despite Sours's evident distress at this point, Allison did not administer insulin kept at the jail, did not call Sours's pharmacy to find out his regular dose, and did not order insulin for his use. Nor did she send Sours to the emergency room, though Dr. Belhasen stated she expected Allison would have done so. Instead, late on Wednesday afternoon she placed Sours in a medical observation cell, left instructions for the guards to monitor his blood sugar, and left for a

long weekend with the knowledge that no medical professionals would be at the jail for five days, until the following Monday. The last time she saw Sours, he was wrapped in a blanket and lying down. Allison testified that she also knew weakness and sleepiness to be common symptoms of diabetic ketoacidosis.

Before she left, Allison claims she talked to Randy Madan, the jail administrator, about Sours's "critical" situation—due to his lack of cooperation—but Madan denies having this conversation with her. Allison's note to the guards said only "[p]lease check James Sours blood sugar before eating + chart daily. – no insulin available yet. Dr. S. Belhasen ordered blood work + will see him Monday." The note did not indicate what should be done in case of continuing nausea or confusion, increasing blood sugar levels, or if Sours refused to test his blood sugar. Allison says she expected that the guards would call her if Sours refused to test or would take Sours to an emergency room if he appeared to be in trouble, although she did not expect the guards to know the symptoms of ketoacidosis. According to Plaintiff's nursing expert, the normal, competent nursing practice based on the information available to Allison would have been to recognize the potential for a significant change in a patient with diabetes and hypertension who was also detoxing and to arrange for a nurse to be on site or for Sours to be transferred to acute medical care. The expert said that Allison "should have known the patient's health could be jeopardized by her lack of performance."

As a result of Allison's failure to respond to Sours's condition, a series of events were set into motion. Multiple guards on various shifts observed Sours's worsening condition, including chest pain and nausea, but did little to help him. Unlike Nurse Allison, they were not fully aware of Sours's potentially life-threatening condition.

5

When the night shift took over at midnight, they were informed by the previous shift that Sours was diabetic, irritable, and in medical observation. At 3:15 am on Thursday, July 15, Sours complained to Deputy Jailer Tony Allen, the shift supervisor, of chest pain. Allen's report noted that he would monitor Sours "continuously" and would take "appropriate actions" if his condition worsened. At 3:21 am, Allen and another guard observed Sours sticking his fingers down his throat and determined that he was trying to throw up, but there is no record of any action taken in response. At 6:17 am, Allen and another guard took Sours out of his cell because he said his blood pressure was "out of control." They determined that his blood pressure was 95/7 but did not check Sours's blood sugar, as Allison had instructed, on the basis that Sours verbally told them "his sugar was ok." According to the other guard, Sours was still complaining of chest pains, but this information was not in the incident report. When Allen left around 8:00 am, he did not tell the incoming shift anything about Sours's condition other than what he included in the incident reports.

Deputy Jailer Paul Griffith took over as supervisor at 8:00 am on Thursday. At 2:02 pm, Griffith attempted to distribute medication to Sours three times, presumably the nausea medication, but Sours refused. A blood sugar log says that Sours refused to test his blood sugar at 2:40 pm, but Griffith claims that he did not attempt to test it. Griffith admits that he knew that Sours was diabetic, that he knew the importance of medication and insulin, and that he himself was diabetic, as was his mother. Griffith did not call the doctor or Nurse Allison, but admits that he would have informed them if they had been present at the jail.

Griffith was replaced by other guards at 4:00 pm. At 7:15 pm, a blood sugar log, this time initialed by Deputy Jailer Bryan Montgomery, shows that Sours again refused to test his blood sugar. Montgomery himself does not remember the attempt and reports that he does not

6

recall if he knew that Sours was diabetic but says he would have assumed so. Montgomery did not call the doctor or nurse, and claims that he had no training as to how to respond to diabetic symptoms.

At 10:15 pm, Deputy Jailer Justin Blanton, the evening shift supervisor, observed Sours putting his fingers in his throat trying to make himself throw up and believed it was because Sours was nauseated. There is nothing in the record as to what was done in response. Blanton says that he did nothing, but he also claims that he was unaware of the significance of nausea for a diabetic.

At around 10:40, Deputy Jailer Salyer, while conducting a head count, found Sours lying in his cell breathing but unresponsive. At 10:47, Blanton and Montgomery arrived in Sours's cell to join Salyer. Sours was lying there unresponsive with his eyes open. The three guards discussed taking Sours to the hospital, but decided against it. It is unclear why not, as the hospital was only four-to-five minutes' drive away and Madan had instructed the guards to take inmates to the hospital in the case of an emergency; Montgomery testified that it was because of the difficulty in getting Sours into the police cruiser. Finally, at 10:52, twelve minutes after Sours was first discovered in an unresponsive state, Montgomery called an ambulance. By the time the paramedics arrived at 11:06, Sours was not breathing. He was taken to a medical center, but died at 11:37 pm of diabetic ketoacidosis, with a blood sugar level of 1629 mg/dl.

## II.    STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. *Back v. Nestle USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is not appropriate if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party, here plaintiff. *See Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 375 (6th Cir. 2002). We must view all evidence, and draw all reasonable inferences, in the light most favorable to plaintiff. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.    ANALYSIS

### A.  Law Governing Section 1983 Claims

Title 42 U.S.C. § 1983 creates a private right of action against anyone who, under color of law, deprives a citizen of a right secured by the Constitution. Qualified immunity generally shields government officials, such as the individual defendants here, from such claims unless a jury could find that a constitutional right has been violated and the right is clearly established. *E.g.*, *McKenna v. Edgell*, 617 F.3d 432, 438 (6th Cir. 2010).

Under the Fourteenth Amendment, pretrial detainees have a substantive due process right to adequate medical treatment. *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). The right is "at least as great" as the analogous Eighth Amendment right that convicted prisoners possess. *Id.*; *see also Garretson v. City of Madison Heights*, 407 F.3d 789, 795 (6th Cir. 2005); *Watkins v. City of Battle Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001). Our circuit analyzes the Fourteenth Amendment right using the same test as governs the Eighth Amendment right. *Watkins*, 273 F.3d at 686 (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) and *Farmer v. Brennan*, 511 U.S. 825, 835-37 (1994)). In short, both prisoners and pretrial detainees have a right not to have prison officials act with deliberate indifference toward their serious medical needs, health, or safety. *Id.*; *LeMarbe v. Wisneski*, 266 F.3d 429, 435-36 (6th Cir. 2001). Such indifference can be manifested by prison doctors or medical staff in response to a detainee's medical needs. *Estelle*, 429 U.S. at 104-05.

8

As in other constitutional contexts, "deliberate indifference" that amounts to a constitutional violation falls somewhere in the middle of the culpability spectrum. *Farmer*, 511 U.S. at 835-36; *see also Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849-50 (1998). "[D]eliberate indifference describes a state of mind more blameworthy than negligence," but it also involves something less than acting or failing to act "for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. Rather, in this context, it entails a circumstance in which the prison official denies an inmate humane conditions of confinement when "the official knows of and disregards an excessive risk to inmate health or safety." *Id*. at 837.

Turning to application of the law, we address the claims against Nurse Allison, beginning with the two components of a deliberate indifference claim.

## B. Claims against Nurse Allison

### 1. Section 1983 Claims

The first component of a § 1983 claim is objective: Plaintiff must show that the alleged deprivation by Allison was sufficient to pose a "substantial risk of serious harm" to Sours's health. *Garretson*, 407 F.3d at 796-97. As the district court correctly concluded and Defendants concede, the denial of insulin and medical care to an insulin-dependent diabetic satisfies the objective component. *Id*. at 797.

The test also includes a subjective component. *Watkins*, 273 F.3d at 686. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer*, 511 U.S. at 837. The question of whether an official actually perceived, inferred, or disregarded a risk is a question of fact for the jury "subject to demonstration in the usual ways, including inference

9

from circumstantial evidence." *Farmer*, 511 U.S. at 842; *Clark-Murphy v. Foreback*, 439 F.3d 280, 290 (6th Cir. 2006). Yet a court must also consider other factors—such as the obviousness of the risk, the information available to the official, the observable symptoms, and the expected level of knowledge of the particular official. *Farmer*, 511 U.S. at 842-43; *LeMarbe*, 266 F.3d at 436-39. If a risk is obvious or if it is well-documented and circumstances suggest that the official has been exposed to information such that she must have known of the risk, the evidence is sufficient for a jury to find that the official had knowledge. *Farmer*, 511 U.S. at 842-43.

In *Phillips v. Roane County, Tennessee*, we held that there was sufficient evidence for a jury to infer that the guards knew of a substantial risk of serious harm where a diabetic inmate in a medical observation cell exhibited symptoms of nausea, vomiting, and chest pains. 534 F.3d 532, 540-41 (6th Cir. 2008). Likewise, in *LeMarbe*, this court found that a jury could infer that the prison surgeon had knowledge of the serious risk posed by a bile leak where there was evidence that the surgeon knew of the bile leak and that "any general surgeon would have known" that it was serious and needed to be stopped immediately. 266 F.3d at 434, 436-39.

An inmate's own statements can also be relevant to whether an official could have drawn an inference of a serious risk. In *Garretson*, for example, an insulin-dependent diabetic with no observable symptoms went into diabetic ketoacidosis after she spent a day in pretrial detention with no insulin. 407 F.3d at 794. For the official who had no prior notice of the detainee's condition and who obtained emergency care after learning of her condition, we held that a jury could not infer deliberate indifference. *Id*. at 797. For the two officers that the detainee had informed of her condition, however, we held that "[b]oth officers were allegedly aware of facts from which the inference of substantial risk of harm could be drawn." *Id*. at 798.

When viewed in the light most favorable to Sours, facts in this record show that Allison inferred a substantial risk of serious harm. These facts include: 1) Allison knew that Sours had diabetes and took insulin; 2) Allison's own notes about whether Sours had recently taken insulin are contradictory, and she reported that Sours said he had not taken insulin for over a month and had run out of insulin; 3) ketoacidosis is a well-recognized but preventable complication of insulin-dependent diabetes that can lead to death; 4) Allison knew that observable symptoms of ketoacidosis include nausea, vomiting, chest pains, and confusion; 5) Allison was aware that Sours had symptoms of nausea, vomiting, confusion, and a rising blood sugar level; 6) Allison herself is diabetic; 7) Allison knew that no insulin had been ordered for Sours and that there would be no medical staff at the jail for 5 days; 8) Allison knew Sours was in a "critical situation" because of his refusal to cooperate; and 9) a nursing expert testified that Allison "should have known" of potential significant changes in a patient with diabetes and hypertension who was detoxing and that failing to arrange medical care would put Sours's health at risk.

Allison's own statement of her lack of knowledge regarding Sours's diabetes is not dispositive where the record includes significant documentary and/or circumstantial evidence to the contrary. *Farmer*, 511 U.S. at 842. While the district court focused much of its analysis on Nurse Allison's statement of her knowledge, a court must also consider other factors, including the obviousness of the risk. *Id.* In light of the record—Sours's assertion that he was diabetic and had recently been treated for diabetes, his knowledge regarding diabetes coupled with his ability to test his own blood sugar with the jail's monitor, his high blood sugar levels, and Dr. Belhasen's diagnosis of Sours as diabetic upon reviewing Allison's notes on his condition—a jury could find that Allison's statements suggesting doubt that Sours was in fact diabetic are instead an indication that Allison knew her failure to act was unreasonable under the

11

circumstances. Nor does the fact that Sours himself did not identify the blood sugar levels as the cause of his problem change the analysis. As the jail's nurse, Allison should have been aware that Sours was at risk: she had been told by Sours himself that he "gets confused at times" and was incapable of caring for himself; she knew that his blood sugar was high; and she had observed objective symptoms of ketoacidosis.

The two components of deliberate indifference at met. Allison concedes the objective component: Sours's medical need was sufficiently serious. Based on the record viewed in the light most favorable to plaintiff, a jury could find that Nurse Allison also had subjective knowledge of a substantial risk of serious harm to Sours. We therefore ask the second question—whether a jury could find that Allison acted unreasonably in response to that risk. *Id.* at 844-45. If so, summary judgment for Nurse Allison is precluded.

This record includes facts that, when viewed in the light most favorable to Sours, reveal that Allison consciously acted unreasonably in response to the known risk. These facts include that Allison did nothing to obtain insulin for Sours or administer insulin to him, even though 1) Dr. Belhasen had previously prepared a sliding scale so that Allison would be able to administer insulin to new inmates until they could establish regular maintenance; and 2) Allison knew that during her absence Sours would be without insulin for five days after not having any for at least the two previous days and likely longer. Other facts evidencing an unreasonable response include that: 3) Allison did not ensure that Sours was under the care of medical staff while she was away for the weekend; 4) Allison did not leave instructions for the guards on how to respond to high blood sugar levels or Sours's refusals to check his own blood sugar; 5) Allison knew that Sours had been initially uncooperative; and 6) Allison knew that there would be no medical staff at the jail for 5 days and she did not expect the guards to know the symptoms of

12

ketoacidosis. Finally, expert testimony indicated that: 7) Allison's actions were not reasonable within the bounds of standard nursing practice; and 8) reasonable care would have included insuring that Sours was under the care of medical staff.

The district court held that Allison did not act unreasonably because she took *some* actions in response to Sours's condition, including placing him in a medical observation cell and instructing the guards to monitor his blood sugar. But the provision of some treatment by a medical professional does not immunize that official from liability. *LeMarbe*, 266 F.3d at 438-39. "A government doctor has a duty to do more than simply provide some treatment to a prisoner who has serious medical needs; instead, the doctor must provide medical treatment to the patient without consciously exposing the patient to an excessive risk of serious harm." *Id.* at 439. The same is true for other medical staff. Moreover, our holding that medical care that "is so cursory as to amount to no treatment at all" constitutes deliberate indifference does not support the district court's conclusion that there is no deliberate indifference unless the treatment amounted to no treatment at all. *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843-44 (6th Cir. 2002).

A jury could find that Allison consciously exposed Sours to an excessive risk of serious harm by failing to arrange for insulin injections or medical care. *See also Natale v. Camden Cnty. Correctional Facility*, 318 F.3d 575, 580 (3d Cir. 2003) (stating that even a layperson would have the common sense to know that medical personnel should determine how often a diabetic needs insulin). Therefore, we reverse the district court's grant of summary judgment to Nurse Allison regarding the § 1983 claim against her.

### 2.  State Law Claims against Nurse Allison

In addition to his constitutional claim, plaintiff also alleges that Allison was negligent and grossly negligent in her conduct toward Sours.  Allison asserts qualified official immunity as a defense to these claims.  "Official qualified immunity" protects Kentucky public employees sued in their individual capacity from damages liability for "good faith judgment calls made in a legally uncertain environment." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001).  It applies to negligent performance of 1) discretionary acts or functions, 2) made in good faith, 3) that are within the scope of the employee's authority. *Id.*  In this case, Allison is ineligible for qualified immunity not only because her actions amounted to "ministerial" duties but also because her actions could be construed as the product of bad faith.

Qualified official immunity is defeated if the negligent actions alleged by any defendant amounted to "ministerial" duties rather than discretionary duties.  "An act is ministerial if the duty is absolute, certain, and imperative, involving mere execution of a specific act based on fixed and designated facts." *Autry v. W. Ky. Univ.*, 219 S.W.3d 713, 717 (Ky. 2007).  A discretionary act, in contrast, involves the exercise of "personal deliberation, decisions, and judgment." *Id.*  However, "[a]n act is not necessarily 'discretionary' just because the officer performing it has some discretion with respect to the means or method to be employed." *Yanero*, 65 S.W.3d at 522.  In Kentucky, "[t]he administration of medical care is a ministerial function" and "compliance with the applicable standard of care does not involve a discretionary governmental function." *Gould v. O'Bannon*, 770 S.W.2d 220, 222 (Ky. 1989).  Viewed in a light most favorable to Sours, the record reflects that Allison did not satisfy the applicable standard of care when she failed to procure insulin or administer insulin to Sours, who had been

diagnosed as a diabetic by Dr. Belhasen, had increasingly high blood sugar levels and evidenced symptoms of ketoacidosis.

Allison's defense also fails on the "good faith" prong of the analysis. The Kentucky Supreme Court has recognized that good faith is not present, and qualified immunity is defeated, if the official "'*knew or reasonably should have known* that the action he took . . . would violate the constitutional rights of the plaintiff.'" *Yanero*, 65 S.W.3d at 523 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982)). "'[B]ad faith' can be predicated on a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position, *i.e.*, objective unreasonableness." *Id.*; *see also Autry v. W. Ky. Univ.*, 219 S.W.3d 713, 717 (Ky. 2007) ("[T]here is no immunity if [the discretionary function] violates constitutional, statutory, or other clearly established rights."). In a case like this one, where there is no question the right at issue was clearly established, "bad faith" occurred under Kentucky law if a jury could find that Defendants violated the constitutional right. We have already determined that a jury could find that Allison violated Sours's constitutional rights, therefore, a jury could find that she acted in bad faith and is similarly not entitled to qualified official immunity under state law.

## IV.    THE CLAIMS AGAINST THE REMAINING DEFENDANTS

Plaintiff Sours also brought § 1983 claims of deliberate indifference as well as state law claims of negligence and gross negligence against the remaining Defendants, including against Madan in his official capacity as well as the against the counties served by the jail. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690, 694-95 (1978). We find the failure of any official to arrange for or to provide treatment of Sours's diabetes to be troubling. However, in light of the knowledge and responsibilities of Nurse Allison and the applicable standards governing the

claims against the other defendants, we affirm the decision below granting summary judgment to the remaining defendants.

## V.    <u>CONCLUSION</u>

The district court's grant of summary judgment to Nurse Allison on the § 1983 claims of deliberate indifference as well as the state law claims of negligence and gross negligence is REVERSED and her case is remanded to the district court for trial.  The district court's grant of summary judgment to the remaining defendants is AFFIRMED.