**NOT RECOMMENDED FOR PUBLICATION**

File Name: 20a0438n.06

**Case No. 19-1457**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

<table>
<tr><td>
ESTATE OF RICHIE MAJORS, deceased;<br>
RE'SHANE LONZO, in her capacity as the<br>
Personal Representative of the Estate of Richie<br>
Majors,<br><br>
     Plaintiffs-Appellants,<br><br>
v.<br><br>
ROGER A. GERLACH; ROBERT L. PREVO;<br>
HEIDI SMITH; RENE C. VIVES; HEIDI L.<br>
HERMAN; SAVRITHI KAKANI; JOHN<br>
R.SOLOMONSON; KAREN S. RICH; JOEL A.<br>
EVERTSEN; DORINA A. BLOHM; THOMAS<br>
LANORE; SUSAN HOWARD, in their individual<br>
and official capacities,<br><br>
     Defendants-Appellees,
</td>
<td>
)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)
</td>
<td>
ON APPEAL FROM THE<br>
UNITED STATES DISTRICT<br>
COURT FOR THE EASTERN<br>
DISTRICT OF MICHIGAN<br><br><br><br>
O P I N I O N
</td>
</tr>
</table>

**BEFORE: MERRITT, CLAY, and BUSH, Circuit Judges.**

**CLAY, Circuit Judge**. Plaintiffs—Richie Majors' estate and sister—appeal from the district court's orders dismissing several Defendants and granting summary judgment for the remaining Defendants in this civil rights lawsuit. Plaintiffs claim that rather than treat Majors' multiple sclerosis while he was incarcerated in Michigan prison, Defendants—several of the doctors, physician's assistants, and nurses who evaluated Majors—were deliberately indifferent to his serious medical needs for over four and a half years, in violation of the Eighth Amendment's

prohibition on cruel and unusual punishment. For the reasons set forth below, we **AFFIRM IN PART** and **REVERSE IN PART** the district court's orders. Because a portion of Plaintiffs' claims are barred by the applicable statute of limitations and because the nurses who treated Majors are entitled to qualified immunity, we **AFFIRM** the district court's dismissal of Defendants Gerlach, Smith, and Prevo and its grant of summary judgment for Defendants Solomonson, Rich, Everett, and Blohm. But because there is a genuine issue of material fact as to whether the physician's assistants who treated Majors were deliberately indifferent to his serious medical needs, we **REVERSE** the district court's grant of summary judgment in favor of Defendants Kakani and LaNore.

## BACKGROUND

In March 2010, Richie Majors (a.k.a. James Fullove) began serving a prison sentence in Michigan. During intake procedures, he informed Michigan Department of Corrections ("MDOC") medical staff that he had been diagnosed with and treated for multiple sclerosis ("MS") during a prior term of incarceration with the Minnesota Department of Corrections ("MNDOC"). He had been treated with Interferon beta-1a ("Interferon") injections, which can slow the progression of MS. Although Majors' treatment had some interruptions, Majors generally received Interferon injections twice a week while in MNDOC custody.

In Michigan, Majors was first incarcerated at the Richard A. Handlon Correctional Facility, where Defendant Dr. Roger A. Gerlach evaluated his MNDOC medical records. While Gerlach gleaned that MNDOC had diagnosed Majors with MS based on a 2005 MRI and spinal tap, he was skeptical of Majors' diagnosis. During the time that Gerlach treated Majors—July 2010 through December 2012—Gerlach did not prescribe Interferon to Majors. Nor did he order a diagnostic test to confirm Majors' MS diagnosis or monitor the disease's progress. In October 2010, Majors

allegedly experienced an MS relapse. He reported tingling sensations, numbness in his extremities, and a gait with a diminished range of motion. In August 2011, Majors experienced a second MS relapse: his left foot was dragging, he began to stumble, and his left side felt much weaker than his right. Two nurses who treated Majors, Nurse Defendants Heidi Smith and Robert Prevo, allegedly ignored Majors' requests for treatment following this second relapse.

In December 2012, Majors was transferred to the Gus Harrison Correctional Facility. From that time through July 2014, he was cared for by Defendant Savithri Kakani, a physician's assistant. Like Gerlach, Kakani reviewed Majors' medical records, knew that he had been receiving Interferon injections for MS while in MNDOC custody, and was aware of his MS relapses. Also like Gerlach, Kakani neither treated Majors with Interferon nor ordered a diagnostic test to confirm his diagnosis. Nurse Defendant John Solomonson allegedly ignored Majors' multiple requests for treatment and did not intervene with Kakani to secure medication for his MS.

In July 2014, Majors was transferred to the West Shoreline Correctional Facility. There, his condition steadily deteriorated: his speech was consistently slurred, he suffered from fatigue and weakness in his facial muscles, he lacked eye coordination, and his left foot continued to drag. He experienced several muscle spasms throughout his body, and both his balance and gait were compromised. He required a wheelchair or walker to move around, could no longer remember basic words, could not maintain his own hygiene, and had extensive memory loss. In September 2014, in response to these dire symptoms, Defendant physician's assistant Thomas LaNore presented Majors' case to Corizon Health Medical Director Keith Papendick.[1] Papendick approved an MRI that confirmed Majors' MS diagnosis, over four years after Majors first informed MDOC

---

[1] Both Defendants Kakani and LaNore, at all relevant times, were employees of Corizon Health, Inc., a prison healthcare contractor.

medical staff of his condition. This led LaNore to prescribe weekly Interferon injections beginning in October 2014.

Despite resuming Interferon treatment, Majors' condition continued to decline throughout 2015: he lost coordination and endurance, could no longer use his wheelchair on his own, could not clean himself following bowel movements, and could not dress or shower independently. In April 2015, MDOC transferred him to the St. Louis Correctional Facility. In September 2015, St. Louis staff discovered Majors lying on his cell floor in a puddle of his own urine and feces while breathing shallowly. Majors was then hospitalized and diagnostic tests revealed highly advanced MS damage to his brain. He was discharged in October 2015, but suffered a relapse in November 2015 and again in in February 2016. MDOC ultimately granted Majors medical parole. Records indicate that Majors had regressed to sucking his thumbs and consuming his own feces. Majors was ultimately sent to a Detroit nursing home where he died of MS complications on June 19, 2016.

On October 14, 2016, Plaintiffs filed the present lawsuit against Majors' MDOC medical providers under 42 U.S.C. § 1983 for violating his Eighth Amendment right to be free from cruel and unusual punishment. An amended complaint was filed on March 21, 2017. The Eighth Amendment claim was brought as two counts: Count I was against several of the MDOC nurses who treated Majors: Prevo, Smith, Vives, Herman, Solomonson, Rich, Evertsen, and Blohm (collectively, the "Nurse Defendants"). Count II was against the physician's assistants and medical doctors who treated Majors: Dr. Gerlach, physician's assistant Kakani, physician's assistant LaNore, and Dr. Howard (collectively the "Physician Defendants"). A separate count for wrongful death under Michigan law was brought against all Defendants.

Physician Defendants Gerlach and LaNore moved to partially dismiss the complaint on timeliness grounds while Physician Defendant Kakani moved to be dismissed from the case because Plaintiffs failed to properly plead their wrongful death claim against her. The court granted the motion in part and denied it in part. It found that the relevant statute of limitations barred all claims against Defendants that arose from injuries that occurred prior to May 20, 2013. Thus, Gerlach was dismissed from the case and the claims against Kakani and LaNore were limited. The court also dismissed Nurse Defendants Smith and Prevo in light of the applicable limitations period.

On March 18, 2019, the district court granted summary judgment to the remaining Defendants on Plaintiffs' Eighth Amendment and wrongful death claims.[2] The district court found that Plaintiffs had not presented any genuine issues of material fact as to the whether the remaining Defendants exhibited deliberate indifference in treating Majors. This timely appeal followed.

## DISCUSSION

### A. The Applicable Statute of Limitations

The district court partially granted Defendants' motion to dismiss the complaint because it was filed outside of the applicable statute of limitations. This is a matter of law that we review *de novo*. *Zappone v. United States*, 870 F.3d 551, 555 (6th Cir. 2017). In § 1983 actions, "state law determines which statute of limitations applies" while "federal law determines when the statutory period begins to run." *Harrison v. Michigan*, 722 F.3d 768, 772–73 (6th Cir. 2013). Moreover,

---

[2] The remaining Defendants were physician's assistants LaNore and Kakani, and nurses Solomonson, Rich, Evertsen, and Blohm. The district court had previously dismissed Dr. Howard without prejudice, because Plaintiffs failed to properly serve her within ninety days of the complaint being filed. Plaintiffs have not raised any arguments pertaining to that decision and have therefore forfeited any appeal of Howard's dismissal. Additionally, Plaintiffs noted in their appellate brief that they stipulated to the dismissal without prejudice of Nurses Vives and Herman, and that they "decline . . . to pursue the claims against them on appeal." Appellants' Br. at 9 n.2. These claims are therefore abandoned.

§ 1983 actions "are best characterized as tort actions for the recovery of damages for personal injury and . . . federal courts must borrow the statute of limitations governing personal injury actions from the state where the § 1983 action was brought." *Cooey v. Strickland*, 479 F.3d 412, 416 (6th Cir. 2007). Pursuant to this framework, we have held that § 1983 claims in Michigan are subject to a three-year statute of limitations. *Carroll v. Wilkerson*, 782 F.2d 44, 44 (6th Cir. 1986) (per curiam); *see also* Mich. Comp. Laws § 600.5805(2) ("[T]he period of limitations is 3 years after the time of the death or injury for all actions to recover damages for the death of a person or for injury to a person or property."). Moreover, we have held that "the statute of limitations period begins to run when the plaintiff knows or has reason to know that the act providing the basis of his or her injury has occurred." *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996). "[W]e look to the event that should have alerted the typical lay person to protect his or her rights." *Trzebuckowski v. City of Cleveland*, 319 F.3d 853, 856 (6th Cir. 2003). In the present case, the injury alleged is Majors' worsening MS, brought on by the alleged failures of Gerlach, Prevo, and Smith to treat him with Interferon or order diagnostic tests.

Because Majors' estate is bringing this case, we must also examine if Majors' claim survived his death. We have held that the forum state's law determines whether a § 1983 claim survives an individual's death. *See Crabbs v. Scott*, 880 F.3d 292, 294 (6th Cir. 2018). In *Crabbs*, a § 1983 claimant died before his claim could be resolved and the district court denied his mother's motion to be substituted as plaintiff. *Id.* at 294. We reversed because § 1983 claims "are best characterized as personal injury actions" and Ohio law provides for the survival of personal injury claims. *Id.*

In the present case, Plaintiffs were entitled to bring claims that would not have been time-barred had Majors attempted to bring them while he was alive. Mich. Comp. Laws § 600.5852(1)

("If a person dies before the period of limitations has run or within 30 days after the period of limitations has run, an action that survives by law may be commenced by the personal representative of the deceased person at any time within 2 years after letters of authority are issued although the period of limitations has run."). And under Michigan's statute of limitations, Majors could have brought claims that accrued within three years of the date of filing. Combined with the thirty-day grace period provided by Michigan's survivorship statute, this means that Plaintiffs' claims that accrued three years and thirty days before Majors died were timely.

Majors died on June 19, 2016, and therefore, the accrual date the district court set—May 20, 2013—is accurate. As such, the district court properly permitted the claims against Kakani, LaNore, and the Nurse Defendants that accrued on or after May 20, 2013 to proceed, while dismissing those claims prior to the date and dismissing Gerlach, Smith, and Prevo from the suit.[3]

Plaintiffs' reliance on an unpublished decision of this Court, *Ruiz-Bueno v. Maxim Healthcare Services, Inc.*, 659 F. App'x 830 (6th Cir. 2016), is misplaced. The injury at issue was the pretrial detainee's death itself, and so the statute of limitations did not begin to run until the plaintiffs had access to an internal investigative report that detailed the circumstances surrounding his death, as that event allowed the plaintiffs to discover their cause of action. *Id.* at 834.[4] And because the detainee's death was the injury, he could not have filed a claim while he was alive. But in the present case, as in *Crabbs*, Majors was aware of his injury—Defendants' failure to treat him and the resulting exacerbation of his MS—well before the time of his death. As shown by his

---

[3] While the claims were properly dismissed, evidence from before May 20, 2013, may be admissible with respect to Plaintiffs' claims against the remaining Defendants. *See Black Law Enforcement Officers Ass'n v. City of Akron*, 824 F.2d 475, 483 (6th Cir. 1987) ("The decision whether to admit evidence is based on its relevancy and probativeness, not on whether the evidence is derived from events that occurred prior to a certain time period." (citation omitted)).

[4] There was also no suggestion in *Ruiz-Bueno* that the decedent, who had a mental illness and died less than a month after entering the jail, should have brought suit regarding his medical care prior to his death.

various complaints and requests for treatment to prison medical staff, Majors knew of Defendants'

refusal to treat his illness and of the resulting need to "protect his . . . rights." *Trzebuckowski*, 319

F.3d at 856.[5]

Plaintiffs alternatively argue that even if the statute of limitations was correctly calculated

by the district court, the court should have permitted additional, limited discovery on whether the

limitations period should have been tolled under Michigan's mental incapacity provision. *See*

Mich. Comp. Laws § 600.5851(1). But Plaintiffs did not raise this argument until their motion for

reconsideration of the partial dismissal of their complaint.

Plaintiffs styled their motion as a "motion for reconsideration pursuant to E.D. Mich. L.R.

7.1(h)(3)," R. 46, Mot. for Reconsideration, PageID # 383, and our holdings indicate that motions

for reconsideration generally may not raise new issues. *See Dean v. City of Bay City, Mich.*, 239

F. App'x 107, 111 ("A motion for reconsideration based on Rule 59(e) or Rule 60(b) is not the

proper vehicle for asserting a new claim for the first time."); *Sault Ste. Marie Tribe of Chippewa

Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998) (holding that parties may not use Rule 59(e)

motions to "raise arguments which could, and should, have been made before judgment issued"

(quoting *FDIC v. World Univ. Inc.,* 978 F.2d 10, 16 (1st Cir. 1992))).

Plaintiffs were in possession of Majors' MDOC medical records when the complaint was

filed and when Defendants moved to dismiss based upon the statute of limitations. Those records

clearly evinced his declining mental health due to his MS relapses. The possibility of Majors'

---

[5] Plaintiffs do not contend on appeal that Majors' death was an independent injury that triggered a new three-year statutory period under Michigan personal injury law. Admittedly, the death of the original plaintiff in *Crabbs* was unrelated to the underlying § 1983 claim and the original plaintiff had already filed his § 1983 claim by the time he died, whereas in the present case, Majors' death is closely related to his MS treatment (or lack thereof) and he did not file a lawsuit before passing away. We leave for another day whether the death of a § 1983 plaintiff can constitute a separate "injury" in cases where their death is an alleged result of the defendants' conduct.

mental incapacity was obvious. Even if Plaintiffs required further discovery or expert analysis to fully argue that Majors was mentally incapacitated during his incarceration, Plaintiffs have not demonstrated why this argument could only be raised after the district court partially granted Defendants' motion to dismiss. Therefore, the district court did not err in denying Plaintiffs' motion for reconsideration.

**B. Summary Judgment for the Remaining Defendants**

**Standard of Review**

We review the district court's order granting summary judgment to the remaining Defendants *de novo*. *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 403 (6th Cir. 1997). To be entitled to summary judgment, the movant must have demonstrated that there was no genuine dispute as to any material fact, thereby entitling it to judgment as a matter of law. Fed. R. Civ. P. 56(a). A "material" fact is one that "might affect the outcome of the suit under the governing law," and a genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We examine the facts in the light most favorable to the nonmoving party and draw all reasonable inferences therefrom in its favor. *See Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Importantly, a court may not "weigh the evidence and determine the truth of the matter" in deciding a motion for summary judgment. *Anderson*, 477 U.S. at 249. But if the evidence is "merely colorable" or "not significantly probative," then "summary judgment may be granted." *Id.* at 249–50.

**Analysis**

The Eighth Amendment to the Constitution prohibits "cruel and unusual punishments." The Supreme Court has held that "deliberate indifference to serious medical needs of prisoners

constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation omitted). And "deliberate indifference to a prisoner's serious illness or injury states a cause of action under [§] 1983." *Id.* at 105.

Deliberate indifference claims contain an objective component and a subjective component. The objective component requires that the deprivation of medical treatment be "sufficiently serious." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *accord Farmer v. Brennan*, 511 U.S. 825, 834 (1994). We have held that a "sufficiently serious" medical need is a medical condition that has been "diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013) (citing *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008)).

We have generally held that when a deliberate indifference claim is based on a delay in treatment, rather than the failure to treat at all, the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Santiago*, 734 F.3d at 590 (quoting *Napier v. Madison Cty.*, 238 F.3d 739, 742 (6th Cir. 2001)). In *Santiago*, because the plaintiff had received some treatment—in the form of medication for a skin condition that caused him severe pain and limited his mobility, as well as a wheelchair and cane—he needed to present verifying medical evidence establishing the detrimental effect of the delay in receiving the specific additional treatment he wanted. *Id.* at 590–91. His failure to do so meant he could not satisfy the objective component. *Id.* at 591. Furthermore, we have more recently observed that "when an inmate has received on-going treatment for his condition and claims that this treatment was inadequate, the objective component of an Eighth Amendment claim requires a showing of

care 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018) (quoting *Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005)).[6]

While meeting the requirement for verified medical evidence "will often require 'expert medical testimony,'" *id.* (quoting *Anthony v. Swanson*, 701 F. App'x 460, 464 (6th Cir. 2017)), evidence in a prisoner's medical records can suffice in some cases, *see Cobb v. Pramstaller*, 475 F. App'x 575, 580 (6th Cir. 2012); *see also Jackson v. Gibson*, 779 F. App'x 343, 346 (6th Cir. 2019).

Alternatively, even without such verified medical evidence, a plaintiff can "establish the objective component by showing that the prison . . . provided treatment 'so cursory as to amount to no treatment at all.'" *Rhinehart*, 894 F.3d at 737 (quoting *Dominguez v. Correctional Med. Servs.*, 555 F.3d 543, 551 (6th Cir. 2009)); *see also Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843–44 (6th Cir. 2002) ("When the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." (quoting *Mandel v. Doe,* 888 F.2d 783, 789 (11th Cir. 1989))). In *Mandel*, the Eleventh Circuit held that a physician's assistant's failure to inform his superior or a medical doctor of a prisoner's injured leg constituted deliberate indifference. 888 F.2d at 789. And in *Darrah v. Krisher*, 865 F.3d 361, 370 (6th Cir. 2017), we reversed the grant of summary judgment for a physician because the plaintiff demonstrated a genuine dispute as to whether medication used to treat his condition—

---

[6] We did not say in *Miller* that the objective component requires a showing of grossly inadequate medical care with respect to claims of inadequate treatment, but instead we held that doing so provides a way for an inmate to establish deliberate indifference separate from the "mixed objective and subjective standard" established in *Farmer*. *See Miller*, 408 F.3d at 819. It is therefore unclear why we included this language as part of the objective component in *Rhinehart*. And cases like *Santiago* did not do so. *See* 734 F.3d at 590 (articulating the objective component). This ambiguity in our doctrine notwithstanding, Plaintiffs have conceded that this is an element of the objective component in inadequate care claims. Appellants' Reply Br. at 12–13.

Methotrexate—was "so ineffective . . . that it was essentially the equivalent of no treatment at all." And "[a]lthough the record indicate[d] that [defendant doctor] monitored Darrah for infections during the period that he was on Methotrexate, the question of whether it was reasonable to continue to keep him on a drug that had proven ineffective and whether that course of treatment constituted deliberate indifference [was] a question best suited for a jury." *Id.*

Moreover, prior to these cases we had already indicated that although in situations "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law . . . in some cases the medical attention rendered may be so woefully inadequate as to amount to no treatment at all." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976) (citing *Tolbert v. Eyman*, 434 F.2d 625, 626 (9th Cir. 1970)). And in *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011), we relied on the distinction drawn in *Westlake* to affirm the grant of summary judgment for prison medical officials who treated an inmate's neck and toe injuries. The prisoner received thorough treatment, including prompt examinations, an x-ray and soft cervical collar for his neck, neck surgery, and an x-ray and tape for his toe. *Id.*

Because the Eighth Amendment prohibits cruel and unusual *punishments* rather than *conditions*, the Supreme Court has also required that claimants meet a subjective component. *Farmer*, 511 U.S. at 837. This subjective component requires a prisoner to demonstrate that prison officials had a "sufficiently culpable state of mind" in denying them medical care, namely one that amounts to deliberate indifference to their serious medical need. *Wilson*, 501 U.S. at 297; *accord, e.g.*, *Alspaugh*, 643 F.3d at 169. Under our case law, deliberate indifference means "something

more than mere negligence," but may be shown "by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835.

Ultimately, an official must have known of and disregarded "an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. She "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference." *Id.* We have emphasized that "[k]nowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Horn by Parks v. Madison Cty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994). A prison official can escape liability by showing that they "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. Yet, we have held that "[a] government doctor has a duty to do more than simply provide some treatment to a prisoner who has serious medical needs; instead, the doctor must provide medical treatment to the patient without consciously exposing the patient to an excessive risk of serious harm." *LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001). And a plaintiff "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842.

With these principles in mind, we now consider the claims against each Defendant in turn.

### i. The Physician Defendants[7]

#### 1. Savithri Kakani

Defendant physician's assistant Kakani evaluated and treated Majors from December 2012 through July 2014. Plaintiffs allege that Kakani's failures to either confirm Majors' MS diagnosis or prescribe Interferon injections to remedy his symptoms and arrest the progress of his disease constitute deliberate indifference. The district court held that "in 2013, Majors' medical need was not objectively serious" because Kakani concluded that Majors was in remission, and so "this can be neither a situation where a physician diagnosed a condition mandating prompt treatment, nor where a lay person would recognize that Majors needed care." R. 170, Dist. Ct. Order, PageID # 3110. Therefore, the court held that Plaintiffs needed to present "verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Id.* (citing *Santiago*, 734 F.3d at 590). Namely, evidence proving that the delay in performing diagnostic tests or treating Majors' MS exacerbated his condition or caused additional pain and suffering.[8]

The district court erred because a reasonable jury could find that Majors' need for treatment was "obvious"—he had a documented diagnosis of MS and history of both Interferon and steroid

---

[7] The fact that Defendants Kakani and LaNore are physician's assistants, rather than physicians, does not absolve them liability. Although it was Corizon Medical Director Papendick who ultimately authorized Majors' MRI, this Court has considered deliberate indifference claims against physician's assistants who allegedly did not request an MRI. *See Palmer v. Wagner*, 3 F. App'x 329, 330 (6th Cir. 2001) (affirming grant of summary judgment for physician's assistant because the record showed he did request an MRI). And LaNore himself was able to prescribe Interferon after Majors' MRI established the severity of his MS. Defendants also do not claim that their positions immunize them from liability for deliberate indifference even if Majors could meet the objective and subjective components of the Eighth Amendment test.

[8] The parties focus on the appropriateness of treating Majors with Interferon, but his prison medical records indicate that he was also treated with steroids while in Minnesota's prison system. And one of Defendants' experts notes that intravenous steroids can help increase recovery time during a relapse. R. 113-7, Expert Report of Chakrapani Ranganathan, PageID # 1251. Thus, steroids were an available option to treat Majors as well.

treatment—and that the treatment rendered by Kakani was "so cursory as to amount to no treatment at all," *Terrance*, 286 F.3d at 843–44, thereby satisfying the objective component, *Rhinehart*, 894 F.3d at 737. Rather than treat Majors' MS symptoms or even request an MRI to monitor his disease, Kakani did nothing beyond evaluate him in May 2013 and record her notes. Yet a May 21, 2013, treatment note reveals that she personally knew that Majors had been diagnosed with MS in 2005, had been previously treated with Interferon, and that his last recorded MRI was in June 2008. R. 119, MDOC Records, PageID # 1475. And while Majors felt "good" and reported "no issues" at that appointment, *id.*, Majors complained to Kakani about his MS on several other occasions, including when he appears to have relapsed. In January 2013, he complained about "not receiving services . . . about his MS" and that as a result "he is managing the best he can." R. 141-7, MDOC Records, PageID # 2192. In February 2013, he "report[ed] signs and symptoms consistent with MS," and in March 2013, he complained about not receiving any MS treatment, including Interferon injections. *Id.* at 2189–90. A June 2013 evaluation reported that Majors' MS has caused "a significant loss of functioning for him emotionally and physically" and that "[h]e easily tires, has difficulty walking and feels that his memory has significantly deteriorated due to the MS." *Id.* at 2176. The only hint of an explanation for Kakani's minimal response to these complaints was provided by her after she evaluated Majors personally in May 2013. She noted that "[patient] has [diagnosis] of ms not on meds looks like in remission." *Id.* at 2188. Her follow-up action was to request Minnesota prison medical records detailing Majors' 2008 MRI and neurology consultation.

Majors' treatment is at least—if not more—deficient than that received by the plaintiff in *Darrah*. Kakani did not even seek to determine if her approach of not treating Majors was working because she never sought an MRI for him. In *Darrah*, the defendant physician at least prescribed

medication in an attempt to treat the plaintiff's condition. 865 F.3d at 370. The important link between the two cases, however, is that in both the defendant's course of treatment was ineffective and the defendant disregarded the plaintiff's complaints of symptoms. *See also Dominguez*, 555 F.3d at 551 (finding genuine issue as to whether treatment was so cursory as to amount to no treatment at all because inmate was returned to non-air conditioned cell despite suffering from heat stroke). Moreover, Majors' treatment sharply differed from that rendered in *Santiago*—where we required verified medical evidence—because the plaintiff's skin condition and mobility issues were being addressed with multiple medications, a cane, and a wheelchair. 734 F.3d at 590–91; *see also Rhinehart*, 894 F.3d at 739 (finding that "this is not a case involving cursory treatment amounting to no treatment at all" because the plaintiff received multiple diagnostic tests, pain medications, a referral to a specialist, and was given a "recognized" medication for his condition). In the present case, Kakani ignored Majors' MS. She did not request an MRI to confirm his diagnosis nor treat his MS with Interferon or relapses with steroids. And because Kakani did not ascertain how far his MS had progressed, her conclusion that he "looks like [he is] in remission" in May 2013 could not be validated. As such, a reasonable jury could find that her course of treatment was "so cursory as to amount to no treatment all." *Terrance*, 286 F.3d at 843.[9]

The district court correctly found that the objective component was met with respect to Majors' condition in 2014. The court accurately cited to several "kites" (i.e., missives sent by

---

[9] Even if verified medical evidence were required in this case, Plaintiffs have shown a genuine issue as to the detrimental effect of the delay. *See Santiago*, 734 F.3d at 590. Because medical records can constitute verified medical evidence, *see Cobb*, 475 F. App'x at 575, and because these records show that Majors had MS and that it progressed unabated while Kakani failed to monitor his condition or treat it, Plaintiffs have met the objective component. As the Defendants' own expert attests, while MS cannot be cured it can be limited through prompt treatment—both during relapses and between them. R. 113-7, Expert Report of Chakrapani Ranganathan, PageID # 1251. Kakani's failure to determine if resuming Interferon or steroid treatment was appropriate for Majors was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miller*, 408 F.3d at 819.

Majors to prison medical staff) establishing that Majors regularly complained about his pain and his MS. Such evidence undermined Kakani's assumption that Majors was in remission while she treated him. On April 21, 2014, Majors complained of MS symptoms and requested medication for them. On April 24, 2014, Majors complained again. On May 4, 2014, Majors once more reiterated his complaint and request for treatment. In light of these kites the seriousness of Majors' MS was manifest in 2014. As such, a reasonable jury could find that Plaintiffs meet the objective component regarding Kakani's treatment of Majors in 2014.

With respect to the subjective component, the district court found that in 2013, Kakani "did not subjectively perceive facts from which to infer substantial risk to Majors." R. 170, Dist. Ct. Order, PageID # 3112. She believed he was in remission and her failure to ensure that he received an MRI or further diagnostic testing does not amount to deliberate indifference because "Kakani did not see any risk to Majors at the time." *Id.* Then in 2014, she addressed any risk she perceived by consulting with a physician and determining that Majors treatment plan did not need to change. These determinations ignore the fact that the circumstances surrounding treatment can establish the requisite substantial risk even if the prison official does not expressly acknowledge it. *See, e.g.*, *Horn*, 22 F.3d at 660 ("Knowledge of the asserted serious needs *or of circumstances clearly indicating the existence of such needs*, is essential to a finding of deliberate indifference.") (emphasis added). It was known to Kakani that Majors suffered from MS, that he was periodically relapsing while in MDOC custody, and that he was directly requesting treatment he had previously received for years.

While Kakani need only have "responded reasonably to the risk," *Farmer*, 511 U.S. at 844, she needed to "do more than simply provide some treatment," *LeMarbe*, 266 F.3d at 439. She needed to treat him "without consciously exposing [Majors] to an excessive risk of serious harm."

*LeMarbe*, 266 F.3d at 439. His worsening symptoms under Kakani's care suggest that she failed to prevent such exposure. She only reviewed his chart and records, scheduled follow-up appointments with him, and arranged for a consultation with an optometrist. The most substantive action she took was to consult a doctor about his MS. But all that record notes is that "pt not on any meds for ms discussed with md the other day." R. 119, MDOC Records, PageID # 1485. It is silent as to what was discussed, who the doctor was, and why his treatment plan was left unchanged despite Majors' preexisting symptoms and recent complaints of relapse. This treatment failed to address his chronic MS. Without diagnostic testing, neither Kakani nor her supervising physician could be sure that Majors was in remission, let alone that the decision to not prescribe any MS-specific treatment was reasonable. *See Farmer*, 511 U.S. at 843 n.8 (holding that a prison official may not escape liability for deliberate indifference "if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist").

In light of these deficiencies in treating Majors, summary judgment was improperly granted for Defendant Kakani. A reasonable jury could find that because of Majors' medical history and contemporaneous MS symptoms, Kakani "(1) 'subjectively perceived facts from which to infer substantial risk to the prisoner,' (2) 'did in fact draw the inference,' and (3) 'then disregarded that risk.'" *Santiago*, 734 F.3d at 591 (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)). She knew from his records that he had MS, had been treated with Interferon and steroids before, and was aware of his requests to resume Interferon treatment. *Cf. LeMarbe*, 266 F.3d at 440 (finding subjective component met where a doctor was aware of bile leak in a prisoner's abdomen that "if not stopped immediately, would expose [prisoner] to a substantial risk of serious harm; and that [the doctor] disregarded such risk by failing to take the actions he knew were

necessary to avoid the potentially serious harm to [prisoner]"). Kakani ignored the documented signs of Majors' MS in refusing to treat him or even request diagnostic testing. Both decisions significantly delayed his treatment, exacerbated his symptoms, and allowed for the irreparable progression of his debilitating disease. *Cf. Farmer*, 511 U.S. at 842 ("[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.").

Therefore, a reasonable jury could find that Plaintiffs' claim against Kakani meets the objective and subjective components and that she was deliberately indifferent to Majors' serious medical need.

### 2. Thomas LaNore

Physician's assistant LaNore treated Majors from July 2014 through April 2015. Majors' MDOC records from this time are replete with evidence of severe MS. He had muscle spasms, he dragged his left foot, his speech was slurred, and his smile was uneven with a left-side droop. LaNore himself noted that Majors was presenting with MS. And because of Majors' MS-related mobility problems, he was given a wheeled walker in August 2014. And on September 18, 2014, LaNore successfully requested an MRI for Majors which re-confirmed his diagnosis and resulted in the resumption of Interferon treatment the following month. The district court recognized that Majors' condition was sufficiently obvious, but because his need was addressed within a reasonable time frame the objective component was not satisfied. *See Mattox v. Edelman*, 851 F.3d 583, 598 (6th Cir. 2017) ("'[W]here a plaintiff's claims arise from an injury or illness so obvious that even a layperson would easily recognize the necessity for a doctor's attention,' the plaintiff can meet the objective prong by showing 'that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame.'" (quoting *Blackmore v. Kalamazoo County*, 390 F.3d 890, 900 (6th Cir. 2004))). However, given the severity

of Majors' condition his need for treatment was not necessarily addressed quickly enough. In *Blackmore*, we held that the plaintiff's medical need was not addressed "within a reasonable time frame" because "after Blackmore suffered for two days, making unrelenting complaints and vomiting, a nurse identified 'classic signs of appendicitis' and doctors performed an appendectomy." *Blackmore*, 390 F.3d at 900. Similarly, Majors suffered for two months while at West Shoreline, waiting for the Corizon bureaucracy to finally take his complaints of MS seriously, order the necessary testing, and provide him with severely delayed treatment. *See also Darrah*, 865 F.3d at 369 (finding genuine issue where doctor did not treat plaintiff's condition with medication for three months after arrival at prison, despite the doctor being aware of the plaintiff's condition and need for medication).[10]

With respect to the subjective component, the district court found that LaNore did not demonstrate deliberate indifference towards Majors' condition. He sought to confirm Majors' diagnosis by waiting for the receipt of certain Minnesota records from 2005. It was only after discovering that the records did not exist that he requested an MRI to confirm Majors' MS diagnosis. The district court held that "LaNore repeatedly followed up with Majors' care and ensured that he received the appropriate testing and medication" and that waiting to confirm Majors' diagnosis before beginning the injections did not show "that he had a sufficiently culpable state of mind." R. 170, Dist. Ct. Order, PageID # 3117.

---

[10] Defendants' reliance on two experts reports stating that both LaNore and Kakani provided adequate care is misplaced. *See* R. 113-6, Expert Report of Randall Stoltz, PageID # 1232–48; R. 113-7, Expert Report of Chakrapani Ranganathan, PageID # 1249–59. For one, the district court did not consider the reports in granting summary judgment for Defendants nor rule on the merits of Plaintiffs' motion to strike the reports. Thus, it is unclear if we can do so on appeal. *See Anchor v. Linton*, 230 F.3d 1357, 1357 n.1 (6th Cir. 2000) (table). More importantly, the expert reports are conclusory and provide no explanation for why the physician's assistants were justified in declining to monitor Majors' MS via an MRI or to resume his Interferon regimen or treat his relapses with steroids. The experts do not consider all of Majors' requests for treatment or each of his complaints of relapse and do not explain why Kakani's assumption that Majors was in remission in 2013 was well-founded.

In reaching this conclusion, the district court impermissibly "weigh[ed]" the evidence before it. *Anderson*, 477 U.S. at 249. When Majors arrived at West Shoreline, he came with a lengthy medical history indicating a prior diagnosis and treatment of MS, but a lack of recent diagnostic monitoring or treatment. He also physically manifested clear signs of MS. Despite Majors' repeated kites complaining of his symptoms, LaNore did not evaluate him until August 12, 2014—a month after Majors arrived in West Shoreline. Moreover, LaNore delayed Majors' treatment by another month after that, waiting for the non-existent Minnesota records before asking Corizon Medical Director Papendick to approve Majors' MRI.

We held in *Blackmore* that "[w]hen prison officials are aware of a prisoner's obvious and serious need for medical treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay creates the constitutional infirmity." 390 F.3d at 899; *see also Jones v. Muskegon County*, 625 F.3d 935, 944 (6th Cir. 2010) (finding a genuine issue as to whether nurses who ignored inmate's kites complaining of abdominal pain and possible cancer were deliberately indifferent by delaying inmate's evaluation by three months because of the suspicion that he was "faking it"). LaNore has not provided a medical reason for the two-month delay. He does not explain why the Minnesota records, which would have been approximately nine years old at that point, were a necessary prerequisite to requesting an MRI to determine the current status of Majors' condition.[11]

Because of the progressive nature of MS, every day that Majors did not receive treatment was a day that his disease continued without any intervention designed to slow or mitigate its

---

[11] The record shows that Majors was rapidly scheduled for an MRI once LaNore sought it. LaNore met with Papendick on September 18, 2014, to request the procedure. On September 19, 2014, LaNore evaluated Majors and noted that Majors was scheduled for an MRI on September 29, 2014. R. 119, MDOC Records, PageID # 1533, 1543. The speed with which LaNore's request was approved and fulfilled underscores how quickly Majors could have been treated previously.

effects. Therefore, a reasonable jury could find that LaNore was aware of a "substantial risk of serious harm" to Majors and disregarded it. *Farmer*, 511 U.S. at 837. As such, Plaintiffs' claim against LaNore survives summary judgment.

**ii. The Nurse Defendants**

The Nurse Defendants raised a defense of qualified immunity to Plaintiffs' Eighth Amendment claims. To defeat this defense, Plaintiffs must demonstrate that the Nurse Defendants (1) violated one of Majors' constitutional rights that was (2) clearly established at the time the violation occurred. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Supreme Court has held that courts may address the questions of whether a right was violated or whether it was established at the time of the violation in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The district court held that no violation occurred. Although this presents a difficult question on appeal, because we find that the right alleged is not "so clearly established in a particularized sense that a reasonable officer confronted with the same situation would have known that his conduct violated that right," *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015), we find that the Nurse Defendants are entitled to qualified immunity without deciding whether the district court correctly found there to be no constitutional violation.

Plaintiffs contend that the Nurse Defendants "shirked their constitutional responsibility when they documented Majors's rapidly deteriorating health, without any mind towards their independent duty to guarantee that his medical treatment comported with the Eighth Amendment." Appellants' Br. at 49. This suggests that the Nurses Defendants should not have deferred to Kakani or LaNore, and instead they should have exercised their own independent medical judgment and more strenuously advocated for Majors to receive an MRI or Interferon treatment much sooner.

No case cited by Plaintiffs puts these nurses on-notice of their duty to do so nor of what events would have triggered the performance of that duty.

For example, in *Winkler v. Madison County*, 893 F.3d 877, 894 (6th Cir. 2018), we held that a nurse's actions did not satisfy the subjective component of a deliberate indifference claim where she "gathered information about [plaintiff's] condition, provided it to a medical professional qualified to evaluate him, and followed the directions of that medical professional." Because the nurse believed that the prisoner's condition would be adequately treated by following those orders, "there [was] no basis to find that she was subjectively aware of a substantial risk of harm to [plaintiff's] health." *Id.* at 895.

That said, in *Sours v. Big Sandy Regional Jail Authority*, 593 F. App'x 478, 479 (6th Cir. 2014), we reversed the grant of summary judgment for a treating nurse whose failure to administer insulin to a pretrial detainee for several days caused him to die from diabetic ketoacidosis. The nurse had an established understanding of diabetes and familiarity with insulin treatment and was expected by her supervising physician to administer insulin when appropriate, yet she wholly failed to treat the detainee's obviously life-threatening diabetic episode. *Id.* at 480–82. As a result, we held that "[a] jury could find that [the nurse] consciously exposed Sours to an excessive risk of serious harm by failing to arrange for insulin injections or medical care." *Id.* at 486; *see also Jones*, 625 F.3d at 944 (finding nurses could be liable for deliberate indifference where they were aware of plaintiff's abdominal pain and cancer risk yet refused his calls for medical aid for months).

While Majors' nurses may have been aware of his diagnosis and treatment history, there is no evidence that they could have meaningfully influenced his course of treatment. Even after taking the evidence in the light most favorable to Plaintiffs, the record before us indicates that all the nurses could have done is essentially what they did do: inform their supervisors of Majors'

condition and complaints. The record does not contain evidence of the nurses' scope of practice or how they could have raised concerns about Majors to other prison medical officials.

Instead, the record aligns this case with *Winkler*, where we held that the plaintiff could not satisfy the subjective component because the defendant nurse believed the plaintiff would be treated for withdrawal by other medical providers. 893 F.3d at 895. Ultimately, there is no clearly established law that the Nurse Defendants' decision to defer to the judgment of their supervising medical providers who had diagnostic and treatment authority "consciously expos[ed] [Majors] to an excessive risk of serious harm." *LeMarbe*, 266 F.3d at 439. As such, even if the Nurse Defendants violated Majors' constitutional rights, they are entitled to qualified immunity.[12]

### iii. Wrongful Death Claim

After granting summary judgment for the remaining Defendants, the district court properly dismissed Plaintiffs' wrongful death action pursuant to Michigan law. This was because we have held that "under Michigan precedent it is clear that a wrongful death action is derivative, rather

---

[12] Other courts have more deeply explored how much nurses may defer to physicians and "[i]n an extraordinary case, it may be possible for the decisions of other courts to clearly establish a principle of law." *Ohio Civil Service Employees Ass'n v. Seiter*, 858 F.2d 1171, 1177 (6th Cir. 1988). Plaintiffs rely on three. *See Hadix v. Caruso*, 461 F. Supp. 2d 574, 598–99 (W.D. Mich. 2006) (finding nurses involved in health care at a state prison could be liable for deliberate indifference for "pattern and practice of non-treatment and uncoordinated treatment," with fatal consequences in some instances); *Perez v. Fenoglio*, 792 F.3d 768, 779 (7th Cir. 2015) (finding plaintiff stated a claim against prison nurse for failing to suture his wound, provide pain medication, or ensure that he received adequate care, where no discovery had occurred regarding the extent of the nurse's authority to treat the injury, the necessity of such treatment, or whether she had contacted supervisors to provide further treatment); *Berry v. Peterman*, 604 F.3d 435, 443–44 (7th Cir. 2010) (finding that a prison nurse was not entitled to summary judgment on a deliberate indifference claim where the nurse ignored the prisoner's complaints of dental pain, did not consult his supervising physician for several weeks, independently responded to the prisoner's complaints, and a reasonable jury could find that the nurse could not justifiably rely on the judgment of physician who lacked dental training or experience). However, the factual circumstances of each of these cases are far too different from the case at bar to "point unmistakably to the unconstitutionality of the conduct complained of," and so they do not alter our view of this Court's case law. *Ohio Civil Service Employees*, 858 F.2d at 1177.

than independent, of a decedent's underlying tort action." *Kane v. Rohrbacher*, 83 F.3d 804, 805 (6th Cir. 1996). The parties do not argue otherwise.

Because we find that Defendants Kakani and LaNore were not entitled to summary judgment on Plaintiffs' Eighth Amendment claim, the wrongful death claims against them are reinstated as well. For Defendants properly dismissed from the suit or for whom summary judgment was correctly granted, the wrongful death claims remain dismissed as well.

## CONCLUSION

For these reasons, we **AFFIRM IN PART** the district court's orders and **REVERSE IN PART**. We **AFFIRM** the part of the district court's orders dismissing Defendants Gerlach, Smith, and Prevo from the suit, limiting the claims against Defendants based upon the statute of limitations applicable to Plaintiffs' action, and granting summary judgment for the Nurse Defendants. We **REVERSE** the part of the district court's orders granting summary judgment for Defendants Kakani and LaNore. The case is **REMANDED** to the district court for further proceedings consistent with this opinion.

**John K. Bush, Circuit Judge, concurring in part and dissenting in part**. I join in generally all of the majority's opinion except for the reversal of the summary judgment granted to the physician's assistants, Savithri Kakani and Thomas LaNore.[1] The evidence, perhaps, could support a jury finding that these individuals committed medical malpractice; but, it does not rise to the level that would permit a finding of deliberate indifference under the Eighth Amendment.

## I. Physician Assistant Savithri Kakani

On November 29, 2012, Majors arrived at Gus Harrison Correctional Facility, where Savithri Kakani is a medical provider. (MDOC Medical Records, R. 119, PageID 1472-1473; Kakani Aff'd., R. 113-4, PageID 1223). Kakani's contact with Majors during his time at Gus Harrison Correctional Facility was relatively limited. The first time she had any involvement was on December 8, 2012, when she entered a chart update with an order to schedule Majors for a chronic care visit. (MDOC Medical Records, R. 119, PageID 1474, Kakani Aff'd.., R. 113-4, PageID 1223). Kakani then met with Majors on May 21, 2013 for the scheduled chronic care visit. (MDOC Medical Records, R. 119, PageID 1480; Kakani Aff'd. R.113-4 at PageID 1223). At that appointment, Majors told Kakani that he had been diagnosed with multiple sclerosis (MS) and had been "on the injections" in the past, but was not currently on any medication. (MDOC Medical Records, R. 119, PageID 1482-84). Kakani documented on Majors's medical charts that he "said he feels good," reported "no issues," and was "not on any meds at this time," noting ultimately

---

[1] There is one additional minor point in the majority opinion with which I respectfully disagree. Footnote 6 of the majority opinion states that there was an ambiguity in the statement of the objective standard in *Rhinehart v. Scutt,* 894 F.3d 721, 737 (6th Cir. 2018). With all due respect, I don't see any ambiguity. *Rhinehart* quotes *Miller v. Calhoun Cty.*, 408 F.3d 408 F.3d 803, 819 (6th Cir. 2005) as part of its discussion of the objective prong of the deliberate-indifference standard where an inmate had received on-going treatment for his condition. In *Miller* the prisoner failed to demonstrate deliberate indifference because he did not show that the care was "'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Id.* (quoting *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 844 (6th Cir. 2001)).

that he was in apparent remission. (MDOC Medical Records, R. 119, PageID 1475-1476; Kakani Aff'd., R. 113-4, PageID 1223). At the end of the appointment, Kakani requested some additional medical records that were not in Majors's chart, including an MRI report and neurology consult note from the Michigan Department of Corrections (MDOC). (*Id*.).

Nearly a year elapsed between this initial chronic care visit and Kakani's next involvement with Majors. Beginning in late April and May 2014, Majors begin sending kites complaining of his MS, stating that he wanted medication. (MDOC Medical Records, R. 119, PageID 1477-1479; 1481). Specifically, on April 21, 2014, Majors sent a kite stating that because of his MS, he was starting to have problems walking, and that he had no medication to prevent a relapse. This kite was received by Nurse Defendant Solomonson, who commented "Thank you for the information." (*Id*. at 1477). Shortly thereafter, on April 24, 2014, Majors sent another kite, in which he complained of his MS again, and stated that he wanted medication. (*Id*. at 1478). As similar to the previous kite, this kite was received by Solomonson, who indicated that Majors's request for medication would be passed along to the main physician (MP). (*Id*.). On May 4, 2014, Majors sent a third kite; this time, he explicitly requested Interferon beta 1a for his MS. (*Id* at 1479). To this, Solomonson responded that Majors's previous requests had been sent to the main physician twice already, and "if they chose to set up appt[,] the MP will set this up. Continuing to kite will not make this process faster." (*Id*.).

On May 21, 2014, Kakani reviewed Majors's chart, which then included an order for a provider visit to take place on or about May 29, 2014. (MDOC Medical Records, R. 119, PageID 1480, Kakani Aff'd., R. 113-4, PageID 1224).

In follow-up to the order, on May 30, 2014, Kakani saw Majors for another chronic care visit. (MDOC Medical Records, R. 119, PageID 1482). At this visit, Majors indicated that he just

wanted health care to be aware of his condition and history. Kakani noted Major's comments to this effect on his chart: "he said he just want[s] us to know about [his MS][.]". (*Id.*). At the time, Majors denied experiencing any gastrointestinal, genitourinary, cardiac, pulmonary, or neurology symptoms. (*Id.*). Kakani also documented that Majors was not on any medications presently, and had undergone a normal neurological examination. (*Id.*). Nonetheless, Kakani ordered an optometry visit to evaluate Majors's possible MS symptoms, and scheduled another chronic care visit. (*Id.* at 1483-84; *see also* Kakani Aff'd., R. 113-4 at PageID 1224). Last, Kakani concluded that there were no medical records available to confirm Majors's diagnosis. (MDOC Medical Records, R. 119, PageID 1499). However, she wrote that she would review Majors's paper chart. (*Id.* at 1482-84; Kakani Aff'd, R. 113-4, PageID 1224).

On June 11, 2014, Kakani reviewed Majors's chart again. While doing so, she entered a notation that she had consulted with a physician regarding Majors's not taking any medications and documented no changes to his treatment plan. (*Id.* at 1500; Kakani Aff'd. R.113-4 at PageID 1224). This entry was Kakani's last contact with anything having to do with Majors. (Kakani Aff'd. R.113-4 at PageID 1224).

The evidence of Kakani's only limited involvement with Majors is insufficient to allow a reasonable jury to find that Kakani acted with deliberate indifference. The proof might be enough to find that she made a mistake in not confirming Majors's MS diagnosis or prescribing any medication. However, the record also reveals the absence of any medical records available for Kakani's review, Majors's denial of symptoms associated with MS, and his denial of currently taking any medication. Furthermore, Kakani consulted with a physician regarding Majors's condition and there was no indication that she failed to follow the physician's instructions to her regarding his treatment. In light of this evidence, which demonstrated that Kakani gave attention

to Majors and did not ignore his condition, it cannot be said that she "provided treatment 'so cursory as to amount to no treatment at all.'" *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018) (quoting *Dominguez v. Correctional Med. Servs.*, 555 F.3d 543, 551 (6th Cir. 2009) (quoting *Terrance v. Northville Reg'l Psychiatric Hosp*/. 286 F.3d 834, 843 (6th Cir. 2002)).

## II.    Physician Assistant Thomas LaNore

The same is the case for Thomas LaNore. His involvement with Majors was during the course of only a little over two months. Nothing he did suggests disregard for the prisoner's condition, let alone the "criminal recklessness" necessary to impose Eighth Amendment liability. *Santiago v. Ringle,* 734 F.3d 585, 591 (6th Cir. 2013) (citing *Farmer v. Brennan*, 511 U.S. 825, 839-40 (1994)).

On July 15, 2014, Majors was transferred to West Shoreline Correctional Facility, where LaNore was a medical provider. (MDOC Medical Records, R. 119, PageID 1486-87; LaNore Aff'd., R. 113-5, PageID 1228). Less than one month later, in early August 2014, Majors sent a kite requesting to see health care staff regarding his MS. Following the kite, Majors met with a nurse, who documented his slow walk, which involved a slight drag of his left foot. The nurse also documented Majors's slurred speech and uneven smile that dropped on the left side. (MDOC Medical Records, R. 119, PageID 1488-1492).

LaNore first saw Majors on August 12, 2014. (LaNore Aff'd., R.113-5 at Page ID 1228). According to LaNore's notes, Majors had "MS like presentation," and had an abnormal neurological examination, which included an ataxic gait and unstable heel walk. (MDOC Medical Records, R. 119, PageID 1495, 1583). He noted that Majors was doing "fair," and subsequently scheduled a one-hour block of time on August 15, 2014 to review Majors's chart. LaNore finished his evaluation by writing that Majors had "not experienced much changes [sic] with his MS," (*id*.

at 1494), and LaNore recognized that treatment would require approval from the Acting Chief Medical Officer (ACMO), (*id.* at 1495; LaNore Aff'd, R. 113-5, PageID 1228).

Three days later, on August 15, 2014, LaNore performed a detailed review of Majors's chart. At this time, LaNore wrote on Majors's chart that he "was Dx [diagnosed], apparently, with MS in 2005. His MS was to have been Dx with MRI and cerebrospinal fluid assay. He was referred to neurology . . . [t]he neurologist question [*sic*] the validity of the MS Dx." (*Id.* at 1499). LaNore also wrote that Majors's "MS remained stable and was treated with Rebif . . . injections 2 times weekly while incarcerated in Minnesota." (*Id.*). Nonetheless, as LaNore concluded, many of the diagnostic test results that were necessary to confirm Majors's MS diagnosis were not in the records that MDOC had provided. (MDOC Medical Records, R. 119, PageID 1499-1500, 1506; LaNore Aff'd,, R. 113-5, PageID 1228-29). Namely, as LaNore observed, there were no records available regarding an "MRI Brain, Cspine or Tspine." (*Id.*). An MS diagnosis could not be confirmed without these records, LaNore wrote, so he ordered another records release form for Majors to complete. (*Id.*).

Less than a month later, on September 12, 2014, LaNore received a response from Hennepin County Medical Center regarding Majors's request for a release of records from February to December of 2005. (*Id.* at 1528). Hennepin County did not have any relevant records. (*Id.*). LaNore then wrote in Majors's chart a recommendation that the "custody" unit observe Majors without his knowledge of their observation and that testing might be required to confirm the MS diagnosis. (*Id.*).

Six days later, on September 18, 2014, LaNore spoke with Corizon's utilization management director, Dr. Keith Papendick. (*Id.* at 68; LaNore Aff'd., R.113-5 at Page ID 1229.). Dr. Papendick orally approved an MRI for Majors. (LaNore Aff'd., R.113-5 at Page ID

1229; MDOC Medical Records, R. 119, PageID 1535). LaNore submitted the "407" (consultation request) and received written approval the same day. (LaNore Aff'd., R.113-5 at Page ID 1229). The record from this day also says that Majors was "[i]ncarcerated into MI facilities and Tx [treatment] was with intermittent prednisone. There were orders for repeat MRI and LP [lumbar puncture] by the Dr." (MDOC Medical Records, R. 119, PageID 1536).

The next day, September 19, Majors visited LaNore, who noted that Majors was scheduled for an MRI of his brain and spine on September 29. (*Id*. at 1543). LaNore noted that Majors had a history of bi-weekly injections of Rebif while incarcerated in Minnesota, and that Majors might elect to re-treat in this manner. (*Id*).

On September 23, 2014, LaNore wrote that Majors's records lacked supporting evidence for a diagnosis of MS. (*Id*. at 1550). He observed that Majors had been given approval for an MRI, and that LaNore would await the results for additional therapy or consultations. (*Id*.).

On October 2, 2014, Dr. Richard Worel made a note in Majors's chart that he had reviewed the prisoner's MRI and the findings were consistent with spinal cord and intracranial demyelination. (*Id*. at 1558). Dr. Worel wrote that he had discussed this with LaNore, and LaNore would address with a "request for appropriate meds for MS." (*Id*.). LaNore documented this as well, and said that he would request Rebif for Majors to take two to three times weekly. (*Id*. at 1560). LaNore submitted the request for Rebif to the ACMO that same day. (LaNore Aff'd., R.113-5 at Page ID 1230). The ACMO approved a different brand of Interferon beta-1a, Avonex, on October 2. (*Id*.). The following day, LaNore ordered Avonex for Majors, and Majors began taking this drug on October 7. (*Id.*; MDOC Medical Records, R. 199 at PageID 1571). After that, LaNore had no further involvement in Majors's care.

This evidence of LaNore's conduct in the short period that he dealt with Majors does not indicate deliberate indifference. LaNore promptly sought Majors's medical records from Hennepin County to confirm the MS diagnosis. Soon after he learned that those records were not available, LaNore set into motion the process for Majors to receive an MRI. LaNore timely reported his observations and recommendations to the physicians, he followed all of the physician's directions, and he did not delay in arranging for the medication that was prescribed. LaNore's actions were not "cursory." *Rhinehart*, 894 F.3d at 737. To the contrary, LaNore addressed Majors's needs as he perceived them and as he was instructed to do by a physician.

### III. Application of the Deliberate-Indifference Standard

Respectfully, I do not believe the majority appropriately applies the "deliberate indifference" inquiry to LaNore and Kakani. To the extent that those individuals made mistakes in Majors's care, that is all they were: mistakes. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "In evaluating the quality of medical care in an institutional setting, courts must fairly weigh the practical constraints facing prison officials." *DesRosiers v. Moran*, 949 F.2d 15, 19 (1st Cir. 1991). "When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). No more demanding of a standard is applied to physician's assistants. This is particularly true here, given that LaNore and Kakani brought Majors's condition to the attention of their supervising physicians and followed the directions of those physicians. *Cf. Turner v. Frey*, 166 F.3d 1215( 6th Cir. 1998) (table) (in granting summary

judgment to prison guards on Eighth Amendment claims arising from a prisoner's death from a seizure in jail, the court stated that "[i]t should be noted that the guards followed the directions of the medical staff at all times"), *cert. denied*, 526 U.S. 1019 (1999).

"Where," as is the case here, "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lukas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). Accordingly, "[a] doctor's errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference." *Rhinehart,* 894 F.3d at 738. "The doctor must have consciously exposed the patient to an *excessive* risk of *serious* harm." *Id.* at 738–39 (emphases in original) (citation and internal quotation marks omitted). Stated another way, a medical provider will not be liable under the Eighth Amendment if she or he provides *reasonable* treatment—even if the treatment is insufficient or even harmful. *Farmer*, 511 U.S. at 838 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.").

The physicians are no longer in this case because, as the majority correctly holds, the claims against them are barred by the statute of limitations. But, this bar is no license to expand the scope of liability for the physician's assistants whose conduct falls within the limitations period. To reiterate, they may be held liable only if they acted with a mental state "equivalent to criminal recklessness." *Santiago,* 734 F.3d at 591 (citing *Farmer*, 511 U.S. at 839–40 (internal quotation marks omitted). For either Kakani or LaNore to be liable under this standard, the Estate must show that she or he "subjectively perceived facts from which to infer substantial risk to [Richie Majors], that [she or he] did in fact draw the inference, and that [she or he] then disregarded that risk" by

failing to take reasonable measures to abate it.  *Comstock*, 273 F.3d at 703 (*citing Farmer*, 511 U.S. at 837).  My review of the record finds no such deliberate indifference—medical malpractice, perhaps—but no Eighth Amendment violation.

I would therefore affirm the district court's judgment in full, including the grant of summary judgment to LaNore and Kakani.